[No. S123808. Dec. 13, 2007.]

ZERLENE RICO et al., Plaintiffs and Appellants, v.
MITSUBISHI MOTORS CORPORATION et al., Defendants and
Respondents.

**COUNSEL**

Pine & Pine, Norman Pine, Beverly Pine; Law Offices of Raymond Paul Johnson, Raymond Paul Johnson, Robert A. Balbuena, Michelle M. West; Law Offices of Jack L. Mattingly and Jack L. Mattingly for Plaintiffs and Appellants.

Yukevich & Sonnett, James J. Yukevich, Alexander G. Calfo, Stephanie A. Hingle; Bingham McCutchen, Leslie G. Landau, Claudia Y. Sanchez; Snell & Wilmer, Michael D. Zimmerman, Richard A. Derevan and Michael S. McIntosh for Defendants and Respondents.

Hugh F. Young, Jr., and Harvey M. Grossman for the Product Liability Advisory Council, Inc., as Amicus Curiae on behalf of Defendants and Respondents.

**OPINION**

**CORRIGAN, J.**—Here we consider what action is required of an attorney who receives privileged documents through inadvertence and whether the remedy of disqualification is appropriate. We conclude that, under the authority of *State Comp. Ins. Fund v. WPS, Inc.* (1999) 70 Cal.App.4th 644 [82 Cal.Rptr.2d 799] (*State Fund*), an attorney in these circumstances may not read a document any more closely than is necessary to ascertain that it is privileged. Once it becomes apparent that the content is privileged, counsel must immediately notify opposing counsel and try to resolve the situation. We affirm the disqualification order under the circumstances presented here.

## Factual Background

Two Mitsubishi corporations[1] (collectively, Mitsubishi or defendants), and the California Department of Transportation (Caltrans), were sued by various plaintiffs after a Mitsubishi Montero rolled over while being driven on a freeway. Subsequently, Mitsubishi representatives met with their lawyers, James Yukevich and Alexander Calfo, and two designated defense experts to discuss their litigation strategy and vulnerabilities. Mitsubishi's case manager, Jerome Rowley, also attended the meeting. Rowley and Yukevich had worked together over a few years. Yukevich asked Rowley to take notes at the meeting and indicated specific areas to be summarized. The trial court later found that Rowley, who had typed the notes on Yukevich's computer, had acted as Yukevich's paralegal. At the end of the six-hour session, Rowley returned the computer and never saw a printed version of the notes. Yukevich printed only one copy of the notes, which he later edited and annotated. Yukevich never intentionally showed the notes to anyone, and the court determined that the sole purpose of the document was to help Yukevich defend the case.

The notes are written in a dialogue style and summarize conversations among Yukevich, Calfo, and the experts. They are dated, but not labeled "confidential" or "work product." The printed copy of these compiled and annotated notes is the document at issue here.[2]

Less than two weeks after the strategy session, Yukevich deposed plaintiffs' expert witness, Anthony Sances, at the offices of plaintiffs' counsel, Raymond Johnson. Yukevich, court reporter Karen Kay, and Caltrans counsel Darin Flagg were told that Johnson and Sances would be late for the deposition. After waiting in the conference room for some time, Yukevich went to the restroom, leaving his briefcase, computer, and case file in the room. The printed document from the strategy session was in the case file. While Yukevich was away, Johnson and Sances arrived. Johnson asked Kay and Flagg to leave the conference room. Kay and Flagg's departure left only plaintiffs' representatives and counsel in the conference room. Yukevich returned to find Kay and Flagg standing outside. Yukevich waited approximately five minutes, then knocked and asked to retrieve his briefcase, computer, and file. After a brief delay, he was allowed to do so.

---

[1] Mitsubishi Motors Corporation and Mitsubishi Motor Sales of America, Inc.

[2] Because the document was confidential, the court ordered it sealed along with relevant portions of the reporter's transcript where the contents of the document were discussed. The document has remained sealed since that time.

Somehow, Johnson acquired Yukevich's notes. Johnson maintained that they were accidentally given to him by the court reporter. Yukevich insisted that they were taken from his file while only Johnson and plaintiffs' team were in the conference room. As a result, Mitsubishi moved to disqualify plaintiffs' attorneys and experts. The trial court ordered an evidentiary hearing to determine how Johnson obtained the document.

The court reporter was deposed and denied any specific recollection of the Sances deposition. She could not testify what she had done with the deposition exhibits that night and could only relate her general practice. She said she generally collects exhibits and puts them in a plastic covering. She did not remember ever having given exhibits to an attorney. She also testified that she had never seen the document in question. If documents other than exhibits remain on a conference table, she leaves them there. The trial court found that the Sances deposition took place over approximately eight hours. It was a document-intense session and documents were placed on the conference table.

Another member of plaintiffs' legal team submitted a declaration supporting Johnson's assertion that he received the document from the reporter. The court ultimately concluded that the defense had failed to establish that Johnson had taken the notes from Yukevich's file. It thus ruled that Johnson came into the document's possession through inadvertence.

The court found the 12-page document was dated, but not otherwise labeled. It contained notations by Yukevich. Johnson admitted that he knew within a minute or two that the document related to defendants' case. He knew that Yukevich did not intend to produce it and that it would be a "powerful impeachment document." Nevertheless, Johnson made a copy of the document. He scrutinized and made his own notes on it. He gave copies to his cocounsel and his experts, all of whom studied the document. Johnson specifically discussed the contents of the document with each of his experts.

A week after he acquired Yukevich's notes, Johnson used them during the deposition of defense expert Geoffrey Germane.[3] The notes purportedly indicate that the defense experts made statements at the strategy session that were inconsistent with their deposition testimony. Johnson used the document while questioning Germane, asking about Germane's participation in the strategy session.

---

[3] Johnson also used the document at the subsequent deposition of defense expert Dennis Schneider.

Defense Counsel Calfo defended the Germane deposition. Yukevich did not attend. Calfo had never seen the document and was not given a copy during the deposition. When he asked about the document's source, Johnson vaguely replied that "It was put in Dr. Sances' file." Calfo repeatedly objected to the "whole line of inquiry with respect to an unknown document." He specifically said, "I don't even know where this exhibit came from."

Only after the deposition did Johnson give a copy of the document to Calfo, who contacted Yukevich. When Yukevich realized that Johnson had his only copy of the strategy session notes and had used it at the deposition, he and Calfo wrote to Johnson demanding the return of all duplicates. The letter was faxed the day after Germane's deposition. The next day, defendants moved to disqualify plaintiffs' legal team and their experts on the ground that they had become privy to and had used Yukevich's work product. As a result, they complained, Johnson's unethical use of the notes and his revelation of them to cocounsel and their experts irremediably prejudiced defendants.

The trial court concluded that the notes were absolutely privileged by the work product rule.[4] The court also held that Johnson had acted unethically by examining the document more closely than was necessary to determine that its contents were confidential, by failing to notify Yukevich that he had a copy of the document, and by surreptitiously using it to gain maximum adversarial value from it. The court determined that Johnson's violation of the work product rule had prejudiced the defense and "the bell cannot be 'unrung' by use of in limine orders." Accordingly, the court ordered plaintiffs' attorneys and experts disqualified.[5]

Plaintiffs appealed the disqualification order. The Court of Appeal affirmed.

DISCUSSION

*Attorney Work Product*

Plaintiffs contend that the Court of Appeal erred by holding that the entire document was protected as attorney work product. We reject that contention.

---

[4] The trial court also held that the document fell under the attorney-client privilege. The Court of Appeal held to the contrary. That issue is not before us and we express no view thereon.

[5] The court continued the case to provide plaintiffs an opportunity to retain new counsel. The court noted that it did not appear that plaintiffs were made privy to the document's contents, so disqualification would be an effective remedy, because there was no issue about plaintiffs providing new counsel with the information. The court also imposed a gag order on all who attended the hearing on the motion to disqualify, specifically instructing plaintiffs' counsel and experts to keep the contents of the document confidential and not reveal any information about the document to plaintiffs and their new attorneys.

The Legislature has protected attorney work product under California Code of Civil Procedure[6] section 2018.030,[7] which provides, "(a) A writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories is not discoverable under any circumstances. [¶] (b) The work product of an attorney, other than a writing described in subdivision (a), is not discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing that party's claim or defense or will result in an injustice."

■ The Legislature has declared that it is state policy to "[p]reserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of those cases." (§ 2018.020, subd. (a).) In addition, the Legislature declared its intent to "[p]revent attorneys from taking undue advantage of their adversary's industry and efforts." (§ 2018.020, subd. (b).)

■ Thus, the codified work product doctrine absolutely protects from discovery writings that contain an "attorney's impressions, conclusions, opinions, or legal research or theories." (§ 2018.030, subd. (a); see *Wellpoint Health Networks, Inc. v. Superior Court* (1997) 59 Cal.App.4th 110, 120 [68 Cal.Rptr.2d 844].) The protection extends to an attorney's written notes about a witness's statements. (See *Rodriguez v. McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 649 [151 Cal.Rptr. 399] (*Rodriguez*); see also *Dowden v. Superior Court* (1999) 73 Cal.App.4th 126, 135 [86 Cal.Rptr.2d 180].) "[A]ny such notes or recorded statements taken by defendants' counsel would be protected by the absolute work product privilege because they would reveal counsel's 'impressions, conclusions, opinions, or legal research or theories' within the meaning of [the work product doctrine]." (*Nacht & Lewis Architects, Inc. v. Superior Court* (1996) 47 Cal.App.4th 214, 217 [54 Cal.Rptr.2d 575].) When a witness's statement and the attorney's impressions are inextricably intertwined, the work product doctrine provides that absolute protection is afforded to all of the attorney's notes. (*Rodriguez, supra,* 87 Cal.App.3d at p. 648.)

---

[6] Unless otherwise indicated, further undesignated statutory references are to the Code of Civil Procedure.

[7] We note that the Court of Appeal relied on former section 2018 in setting forth the work product rule. Section 2018 was repealed. (Stats. 2004, ch. 182, § 22, operative July 1, 2005.) The Legislature replaced it with sections 2018.010–2018.080. Section 2018.040 provides the Legislature did not intend to make any changes to the work product doctrine, referring to the new statutes as a "restatement of existing law" that is "not intended to expand or reduce the extent to which work product is discoverable under existing law in any action."

Plaintiffs urge that the document is not work product because it reflects the statements of declared experts. They are incorrect. The document is not a transcript of the August 28, 2002 strategy session, nor is it a verbatim record of the experts' own statements. It contains Rowley's summaries of points from the strategy session, made at Yukevich's direction. Yukevich also edited the document in order to add his own thoughts and comments, further inextricably intertwining his personal impressions with the summary. (See *Rodriguez, supra*, 87 Cal.App.3d at pp. 647–648.) In this regard, the trial court found: "As to the content of the document, although it doesn't contain overt statements setting forth the lawyer's conclusions, its very existence is owed to the lawyer's thought process. The document reflects not only the strategy, but also the attorney's opinion as to the important issues in the case. Directions were provided by Mr. Yukevich as to the key pieces of information to be recorded, and Mr. Yukevich also added his own input as to the important details, by inserting other words in the notes. The attorney's impressions of the case were the filter through which all the discussions at the conference were passed through on the way to the page." The court concluded, "[T]his court determines that the attorney's directions to record only portions of the conference specific to the attorney's concerns in the litigation are sufficient to support the finding that the notes are covered by the absolute work product [doctrine], as the choices in statements to record show the thought process and are too intertwined with the document."

Although the notes were written in dialogue format and contain information attributed to Mitsubishi's experts, the document does not qualify as an *expert's* report, writing, declaration, or testimony. The notes reflect the *paralegal's* summary along with *counsel's* thoughts and impressions about the case. The document was absolutely protected work product because it contained the ideas of Yukevich and his legal team about the case. (§ 2018.030, subd. (a).)[8]

*Ethical Duty Owed upon Receipt of Attorney Work Product*

Because the document is work product we consider what ethical duty Johnson owed once he received it. Plaintiffs rely on *Aerojet-General Corp. v.*

---

[8] We also reject plaintiffs' contention that defendants waived their right to assert the protection of the work product doctrine because they failed to make a proper objection at Germane's deposition. The record shows that at Germane's deposition, defendants' counsel, Calfo, did not know Johnson was using the document, so he could not raise a specific objection based on the work product doctrine. In fact, when asked how Johnson obtained the document, Johnson told Calfo, "It was put in Dr. Sances' file." Also, Calfo did make numerous objections to the document's use, including those where he stated that he objected "to the exhibit as a whole" because it lacked foundation and "to this whole line of inquiry with respect to an unknown document." Accordingly, there was no waiver.

*Transport Indemnity Insurance* (1993) 18 Cal.App.4th 996 [22 Cal.Rptr.2d 862] (*Aerojet*) to argue that because the document was inadvertently received, Johnson was dutybound to use the nonprivileged portions of it to his clients' advantage. This argument fails. *Aerojet* is distinguishable because there are no "unprivileged portions" of the document.

A review of *Aerojet, supra,* 18 Cal.App.4th 996, demonstrates that it does not assist plaintiffs. Aerojet's insurance brokers had sent a package of materials to Aerojet's risk manager. The risk manager sent them on to Aerojet's attorney, DeVries. Among these documents was a memo from an attorney at an opposing law firm. It was never ascertained how opposing counsel's memo found its way into the package of documents. The memo revealed the existence of a witness whom DeVries ultimately deposed. When opposing counsel learned that DeVries had received the memo and thus discovered the witness, counsel sought sanctions. The trial court imposed monetary sanctions under section 128.5, subdivision (a). (*Aerojet,* at pp. 1001–1002.) The Court of Appeal reversed the sanctions order.

The *Aerojet* court first noted that DeVries was free of any wrongdoing in his initial receipt of the document. The court also observed that the existence and identification of the witness was not privileged. "Nor can 'the identity and location of persons having knowledge of relevant facts' be concealed under the attorney work product rule . . . . [Citation.]" (*Aerojet, supra,* 18 Cal.App.4th at p. 1004.) The defendants claimed no prejudice to their case as a result of the witness's disclosure. Indeed, they prevailed at trial. (*Ibid.*) Because counsel was blameless in his acquisition of the document *and because* the information complained of was not privileged, DeVries was free to use it. (*Id.* at p. 1005.) Plaintiffs' reliance on *Aerojet* founders on the facts that distinguish it. Here, Yukevich's notes were absolutely protected by the work product rule. Thus, Johnson's reliance on *Aerojet* is unavailing, particularly in light of the clear standard set out in *State Fund, supra,* 70 Cal.App.4th 644.

In *State Fund, supra,* 70 Cal.App.4th 644, the plaintiff sent the defendant's attorney (Telanoff) three boxes of documents that were identical to the documents provided during discovery. Inadvertently, the plaintiff also sent 273 pages of forms entitled, " 'Civil Litigation Claims Summary,' " marked as " 'ATTORNEY-CLIENT COMMUNICATION/ATTORNEY WORK PRODUCT,' " and with the warning, " 'DO NOT CIRCULATE OR DUPLICATE.' " (*Id.* at p. 648.) In addition, "[t]he word 'CONFIDENTIAL' [was] repeatedly printed around the perimeter of the first page of the form." (*Ibid.*) When counsel discovered the

mistake and demanded return of the documents, Telanoff refused. The trial court, relying on American Bar Association (ABA) Formal Ethics Opinion No. 92-368 (Nov. 10, 1992), imposed monetary sanctions.

The Court of Appeal framed the issue as follows: "[W]hat is a lawyer to do when he or she receives through the inadvertence of opposing counsel documents plainly subject to the attorney-client privilege?" (*State Fund, supra*, 70 Cal.App.4th at p. 651.) After determining that the documents were privileged and that inadvertent disclosure did not waive the privilege, the court discussed an attorney's obligation. The Court of Appeal disagreed that the ABA opinion should regulate Telanoff's conduct. The court noted that the ABA Model Rules of Professional Conduct on which the opinion was based "do not establish ethical standards in California, as they have not been adopted in California and have no legal force of their own. [Citations.]" (*State Fund*, at pp. 655–656.) Likewise, the court held that an "ABA formal opinion does not establish an obligatory standard of conduct imposed on California lawyers." (*Id.* at p. 656.) Thus, under the circumstances "Telanoff should not have been sanctioned for engaging in conduct which has been condemned by an ABA formal opinion, but which has not been condemned by any decision, statute or [r]ule of [p]rofessional [c]onduct applicable in this state." (*Ibid.*)

The *State Fund* court went on to articulate the standard to be applied prospectively: "When a lawyer who receives materials that obviously appear to be subject to an attorney-client privilege or otherwise clearly appear to be confidential and privileged and where it is reasonably apparent that the materials were provided or made available through inadvertence, the lawyer receiving such materials should refrain from examining the materials any more than is essential to ascertain if the materials are privileged, and shall immediately notify the sender that he or she possesses material that appears to be privileged. The parties may then proceed to resolve the situation by agreement or may resort to the court for guidance with the benefit of protective orders and other judicial intervention as may be justified." (*State Fund, supra*, 70 Cal.App.4th at pp. 656–657.) To ensure that its decision was clear in setting forth the applicable standard in these cases, the court explicitly stated that it "declared the standard governing the conduct of California lawyers" in such instances. (*Id.* at p. 657.)

The existing *State Fund* rule is a fair and reasonable approach.[9] The rule supports the work product doctrine (§ 2018.030), and is consistent with the

---

[9] We also reject plaintiffs' contention that *State Fund, supra*, 70 Cal.App.4th 644, only applies to materials protected by the attorney-client privilege. The Court of Appeal held that there was no distinction "between the attorney-client privilege and the work product privilege in this context [because] . . . [t]he *State Fund* standard applies to documents that are plainly privileged and confidential, regardless of whether they are privileged under the attorney-client

state's policy to "[p]reserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of those cases" and to "[p]revent attorneys from taking undue advantage of their adversary's industry and efforts." (§ 2018.020, subds. (a), (b).)

The *State Fund* rule also addresses the practical problem of inadvertent disclosure in the context of today's reality that document production may involve massive numbers of documents. A contrary holding could severely disrupt the discovery process. As amicus curiae the Product Liability Advisory Council, Inc., argues, "Even apart from the inadvertent disclosure problem, the party responding to a request for mass production must engage in a laborious, time consuming process. If the document producer is confronted with the additional prospect that any privileged documents inadvertently produced will become fair game for the opposition, the minute screening and re-screening that inevitably would follow not only would add enormously to that burden but would slow the pace of discovery to a degree sharply at odds with the general goal of expediting litigation."

■   Finally, we note that "[a]n attorney has an obligation not only to protect his client's interests but also to respect the legitimate interests of fellow members of the bar, the judiciary, and the administration of justice." (*Kirsch v. Duryea* (1978) 21 Cal.3d 303, 309 [146 Cal.Rptr. 218, 578 P.2d 935].) The *State Fund* rule holds attorneys to a reasonable standard of professional conduct when confidential or privileged materials are inadvertently disclosed.

■   Here, it is true that Yukevich's notes were not so clearly flagged as confidential as were the forms in *State Fund, supra,* 70 Cal.App.4th 644. But, as the Court of Appeal observed, "[T]he absence of prominent notations of confidentiality does not make them any less privileged." The *State Fund* rule is an objective standard. In applying the rule, courts must consider whether reasonably competent counsel, knowing the circumstances of the litigation, would have concluded the materials were privileged, how much review was reasonably necessary to draw that conclusion, and when counsel's examination should have ended. (*Id.* at pp. 656–657.)

---

privilege, the work product privilege, or any other similar doctrine that would preclude discovery based on the confidential nature of the document." We agree.

The standard was properly and easily applied here. Johnson admitted that after a minute or two of review he realized the notes related to the case and that Yukevich did not intend to reveal them. Johnson's own admissions and subsequent conduct clearly demonstrate that he violated the *State Fund* rule. We note, however, that such admissions are not required for the application of the objective standard in evaluating an attorney's conduct.

### *Disqualification of Counsel and Experts*

The court properly applied the *State Fund* rule and determined that Johnson violated it. The next question is whether disqualification was the proper remedy. We review the court's disqualification order for abuse of discretion. (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143 [86 Cal.Rptr.2d 816, 980 P.2d 371].)

■ The *State Fund* court held that " '[m]ere exposure' " to an adversary's confidences is insufficient, standing alone, to warrant an attorney's disqualification. (*State Fund, supra,* 70 Cal.App.4th at p. 657.) The court counseled against a draconian rule that " '[could] nullify a party's right to representation by chosen counsel any time inadvertence or devious design put an adversary's confidences in an attorney's mailbox.' " (*Ibid.*) However, the court, did not "rule out the possibility that in an appropriate case, disqualification might be justified if an attorney inadvertently receives confidential materials and fails to conduct himself or herself in the manner specified above, assuming other factors compel disqualification." (*Ibid.*)

■ After reviewing the document, Johnson made copies and disseminated them to plaintiffs' experts and other attorneys. In affirming the disqualification order, the Court of Appeal stated, "The trial court settled on disqualification as the proper remedy because of the unmitigable damage caused by Johnson's dissemination and use of the document." Thus, "the record shows that Johnson not only failed to conduct himself as required under *State Fund,* [*supra,* 70 Cal.App.4th 644,] but also acted unethically in making full use of the confidential document." The Court of Appeal properly concluded that such use of the document undermined the defense experts' opinions and placed defendants at a great disadvantage. Without disqualification of plaintiffs' counsel and their experts, the damage caused by Johnson's use and dissemination of the notes was irreversible. Under the circumstances presented in this case, the trial court did not abuse its discretion by ordering disqualification for violation of the *State Fund* rule.

Plaintiffs attempt to justify Johnson's use of the document by accusing the defense experts of giving false testimony during their depositions. Plaintiffs allege that the statements attributed to the experts in the document contradicted their deposition statements and that the experts lied about the technical evidence involved in the case. As an initial matter, we are not persuaded that any of the defense experts ever actually adopted as their own the statements attributed to them. The document is not a verbatim transcript of the strategy session, but Rowley's summary of points that Yukevich directed him to note. Yukevich then edited the document, adding his own thoughts and comments. As the trial court observed, the document was an interpretation and summary of what others thought the experts were saying.[10]

■ Moreover, we agree with the Court of Appeal that, "when a writing is protected under the absolute attorney work product privilege, courts do not invade upon the attorney's thought processes by evaluating the content of the writing. Once [it is apparent] that the writing contains an attorney's impressions, conclusions, opinions, legal research or theories, the reading stops and the contents of the document for all practical purposes are off limits. In the same way, once the court determines that the writing is absolutely privileged, the inquiry ends. Courts do not make exceptions based on the content of the writing." Thus, "regardless of its potential impeachment value, Yukevich's personal notes should never have been subject to opposing counsel's scrutiny and use."

■ We also reject plaintiffs' argument that the crime or fraud exception should apply to privileged work product in this civil proceeding. Under the work product doctrine "[a] writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories *is not discoverable under any circumstances*." (§ 2018.030, subd. (a), italics added.) With respect to such a writing, the Legislature intended that the crime or fraud exception only apply "in any official investigation by a law enforcement agency or proceeding or action brought by a public prosecutor . . . if the services of the lawyer were sought or obtained to enable or aid anyone to commit . . . a crime or fraud." (§ 2018.050.) By its own terms, the crime or fraud exception does not apply here.

---

[10] While Johnson was testifying on direct examination at the hearing on the motion to disqualify, the court interjected: "The difficulty with that concept [that Germane's direct statement is contained in the document at issue] is that you're assuming it's a direct quote." Soon after the court further stated, "No, listen to me very carefully. You're assuming all along that this is a direct quotation from the so-called experts, the four that you recognize. Whereas, in truth, it may be that it is an interpretation of what someone said through somebody else's mind."

## DISPOSITION

We affirm the Court of Appeal's judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.