Filed 4/15/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DP PHAM, LLC, | G050964 |
| Cross-complainant, Cross-defendant, and Respondent, | (Super. Ct. No. 30-2013-00645166) |
| v. | O P I N I O N |
| C. TUCKER CHEADLE, as Administrator, etc., | |
| Cross-defendant, Cross-complainant, and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Linda S. Marks, Judge.  Reversed and remanded.

C. Tucker Cheadle, in pro. per.; Callahan, Thompson, Sherman & Caudill, Robert W. Thompson and Bryan S. Owens for Cross-defendant, Cross-complainant, and Appellant.

Phan Trial Group and Luan K. Phan for Cross-complainant, Cross-defendant, and Respondent.

                    \*               \*               \*

Appellant C. Tucker Cheadle (Cheadle), as administrator of the estate of Robert F. Obarr (Obarr), appeals from an order denying his motion to disqualify counsel for respondent DP Pham LLC (Pham). Cheadle contends disqualification was required because Pham's counsel improperly obtained copies of privileged communications between Obarr and his attorney, and used those communications to oppose another party's summary adjudication motion in this case. The trial court denied the disqualification motion because it concluded the communications were not privileged.

We reverse. After reviewing copies of the communications, the trial court concluded they were not privileged based on their content. A court, however, may not review the contents of a communication to determine whether the attorney-client privilege protects that communication. The attorney-client privilege is an absolute privilege that prevents disclosure, no matter how necessary or relevant to the lawsuit. The privilege attaches to all confidential communications between an attorney and a client regardless of whether the information communicated is in fact privileged. Accordingly, it is neither necessary nor appropriate to review a communication to determine whether the attorney-client privilege protects it.

Once the proponent makes a prima facie showing of a confidential attorney-client communication, it is presumed the communication is privileged and the burden shifts to the opponent to establish waiver, an exception, or that the privilege does not for some other reason apply. The opponent may not rely on the communication's content to make that showing.

Here, the trial court relied exclusively on the content of the communications to conclude they were not privileged and Pham points to no other evidence to support the trial court's determination. The court also concluded the communications fell with certain statutory exceptions the Evidence Code establishes for

2

the privilege.[1]  As explained below, we conclude the trial court erred in applying these statutory exceptions because to do so here would expand them well beyond their intended scope.

Although we reverse the trial court's order denying the disqualification motion, we remand for the trial court to determine whether the receipt and use of the privileged communications by Pham's counsel warrants disqualification.  As explained below, the decision whether to disqualify counsel is vested in the trial court's sound discretion based on its careful balancing of a variety of factors concerning the disclosure and use of the privileged information.  The court never considered those factors based on its determination the communications were not privileged.

I

FACTS AND PROCEDURAL HISTORY

Pham made three loans toObarr totaling nearly $3 million, and Obarr secured each loan by granting Pham a lien on a mobilehome park he owned in Westminster, California (Property).  This action arose when Obarr allegedly agreed to sell the Property to two different buyers.

In March 2013, Obarr allegedly contracted to sell the Property to S.C.D. Enterprises (SCD) for $7 million based on a right of first refusal under a lease SCD held on the Property.  SCD promptly assigned the purchase agreement to Westminster MHP Associates, LP (Westminster), which allegedly opened escrow on the Property with Obarr.  According to Westminster, it satisfied all contingencies for the sale within 10 days of opening escrow.

Shortly after Westminster opened escrow, Obarr allegedly contracted to sell the Property to Pham for $8 million, which included the balance due on Pham's loansto

---

[1]     All statutory references are to the Evidence Code unless otherwise stated.

3

Obarr. According to Pham, it opened escrow with a separate escrow company and deposited $25,000 toward its purchase of the Property a few days after contracting with Obarr. Obarr also allegedly executed a deed conveying the Property to Pham and deposited the deed with this escrow.

Christi Torres Galla served as Obarr's bookkeeper and personal assistant, managing his business affairs and communicating with others on his behalf. She regularly opened and reviewed Obarr's mail and also typed letters and e-mails for him. At Obarr's instructions, people who communicated with him often copied Galla on their written communications.Obarr regularly discussed his business affairs with Galla and sought her advice. She also attended business meetings with Obarr, and he asked her to witness his signature whenever he signed important documents. Shapleigh Kimes is a licensed attorney who represented Obarr on a variety of matters, and Al Gausewitz was a broker Obarr hired to market and sell the Property.

In April 2013, Westminster filed this action, alleging claims against Obarr for specific performance of the SCD purchase agreement, breach of the SCD purchase agreement (as an alternative to specific performance), breach of the implied covenant of good faith and fair dealing, and declaratory relief. Westminster also alleged claims against Pham and Galla for intentional interference with the SCD purchase contract, and against Pham for declaratory relief.[2] Pham answered Westminster's complaint and filed a cross-complaint against Obarr, alleging claims for specific performance of Pham's purchase agreement, breach of contract, intentional interference with a written contract, breach of the implied covenant of good faith and fair dealing, declaratory relief, and constructive trust.

---

[2] The operative complaint also named the escrow company Pham used as a defendant on the specific performance and intentional interference with contract claims.

4

Obarr died unexpectedly in August 2013. The trial court appointed Cheadle as a special administrator for Obarr's estate and in that capacity substituted Cheadle for Obarr as a party to this action. Cheadle then filed a cross-complaint alleging an interpleader claim against both Westminster and Pham concerning the Property. Based on Pham's loans to Obarr, Cheadle also alleged claims against Pham for usury, intentional misrepresentation, negligent misrepresentation, money had and received, unjust enrichment, reformation, and violation of the unfair competition law (Bus. & Prof. Code, § 17200).

In July 2014, Westminster sought summary adjudication on its specific performance claim. In opposition, Pham submitted Galla's declaration that described her working relationship with Obarr and her rolein his efforts to sell the Property.She also described Obarr's relationship with Kimes, when Kimes stopped representing Obarr regarding the Property's sale, and Kimes's knowledge about certain offers to purchase the Property. The exhibits Galla attached to her declaration included a September 2012 e-mail from Kimes to Obarr, and a January 2013 letter from Kimes to Obarr. Galla was copied on both communications and both clearly identified Kimes as an attorney.

Cheadle promptly filed evidentiary objections, claiming the January letter and a paragraph in Galla's declaration discussing it were inadmissible because the letter was a privileged attorney-client communication between Obarr and Kimes. A few days later, Cheadle filed an ex parte application for an order (1) excluding as evidence the letter and the paragraph discussing it, and (2) disqualifying Pham's counsel. According to Cheadle, Pham's counsel improperly interviewed Galla and "coerce[d]" her to disclose privileged attorney-client communications between Obarr and Kimes to which she was privy as Obarr's bookkeeper and personal assistant. Cheadle argued disqualification was required because Pham's counsel inadvertently received materials that were clearly privileged and confidential, but failed to notify Cheadle and used them to oppose the summary adjudication motion. Pham opposed the ex parte application, arguing Galla

5

voluntarily provided Pham's counsel with the communications, the January 2013 letter was not privileged on its face, and Obarr and Cheadle nonetheless waived the privilege by disclosing the letter and other communications to third parties, by failing to make reasonable efforts to preserve the privilege, and by putting the communications at issue.

The trial court heard Westminster's summary adjudication motion and Cheadle's ex parte application at the same time. The court sustained Cheadle's evidentiary objections and denied Westminster's motion without considering the January letter or the paragraph in Galla's declaration discussing it, but the court declined to decide the disqualification request on an ex parte basis and ordered Cheadle to file a noticed motion to address the issue. Cheadle filed the motion, and based on the attorney-client privilege sought to (1) exclude as evidence the September e-mail, the January letter, and three paragraphs in Galla's declaration discussing those communications; (2) disqualify Pham's counsel for obtaining and using Obarr's privileged communications; and (3) seal Galla's declaration. The trial court twice continued the hearing on Cheadle's motion to allow supplemental briefing on whether any statutory exception to the attorney-client privilege applied to the e-mail and letter.

After considering the supplemental briefs, the trial court denied the motion in its entirety because it found the attorney-client privilege did not protect the e-mail and letter. The court explained Cheadle presented evidence making a prima facie showing the e-mail and letter were confidential communications between an attorney and a client, but the court's in camera review of the communications led it to conclude the privilege did not apply because Kimes's statements in the communications suggested he was not representing Obarr concerning the potential sale of the Property, and therefore as to the Property no attorney-client relationship existed. As authority permitting it to review the e-mail and letter "to determine if [they] are privileged," the trial court cited *OXY Resources California LLC v. Superior Court* (2004) 115 Cal.App.4th 874 (*OXY*).

6

The court further explained the attorney-client privilege did not apply to the e-mail and letter based on the statutory exceptions to the privilege established by sections 957, 960, and 961, which provide the privilege does not protect a communication relevant to an issue (1) "between parties all of whom claim through a deceased client" (§ 957); (2) "concerning the intention of a client, now deceased, with respect to a deed of conveyance, will or other writing, executed by the client, purporting to affect an interest in property" (§ 960); or (3) "concerning the validity of a deed of conveyance, will, or other writing, executed by a client, now deceased, purporting to affect an interest in property" (§ 961).

Cheadle timely appealed from the court's order denying his motion to disqualify Pham's counsel.

II

DISCUSSION

A.      *The Trial Court Erred In Finding the Attorney-Client Privilege Did Not Apply*

1.      Attorney-Client Privilege Governing Principles

Based on the attorney-client privilege, a client may refuse to disclose, and may prevent others from disclosing, confidential communications between a client and his or her attorney.  (§ 954; *Kerner v. Superior Court* (2012) 206 Cal.App.4th 84, 111 (*Kerner*).)  A "'client'" is statutorily defined as "a person who, directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity."  (§ 951.)  A "'confidential communication between client and lawyer'" is statutorily defined as "information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest

7

of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship."  (§ 952.)

The privilege's "fundamental purpose 'is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters. [Citation.] . . . [¶] Although exercise of the privilege may occasionally result in the suppression of relevant evidence, the Legislature of this state has determined that these concerns are outweighed by the importance of preserving confidentiality in the attorney-client relationship. . . . "The privilege is given on grounds of public policy in the belief that the benefits derived therefrom justify the risk that unjust decisions may sometimes result from the suppression of relevant evidence."'" (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 732 (*Costco*).)  "The privilege is absolute and prevents disclosure of the communication regardless of its relevance, necessity or other circumstances peculiar to the case." (*Kerner*, *supra*, 206 Cal.App.4th at p. 111.)

The attorney-client privilege protects the transmission of information regardless of the contentor whether the information is discoverable from other sources. (*Costco*, *supra*, 47 Cal.4th at pp. 735, 739.)  It attaches to a confidential communication between the attorney and the client and bars discovery of the entire communication, including unprivileged material. (*Id*. at pp. 734, 736.)  "'Neither the statutes articulating the attorney-client privilege nor the cases which have interpreted it make any differentiation between "factual" and "legal" information.'" (*Id*. at p. 734.) For example, the Supreme Court has explained, "'[T]he privilege covers the transmission of documents which are available to the public, and not merely information in the sole possession of the attorney or client. In this regard, it is the actual fact of the transmission which merits

8

protection, since discovery of the transmission of specific public documents might very well reveal the transmitter's intended strategy.'"(*Ibid.*)

"The question whether the attorney-client privilege applies to a particular communication is a question of fact if the evidence is in conflict." (*Kerner*, *supra*, 206 Cal.App.4th at p. 117.) "'When the facts, or reasonable inferences from the facts, shown in support of or in opposition to the claim of privilege are in conflict, the determination of whether the evidence supports one conclusion or the other is for the trial court, and a reviewing court may not disturb such finding if there is any substantial evidence to support it.'" (*People v. Gionis*(1995) 9 Cal.4th 1196, 1208 (*Gionis*).)

> 2. Pham Failed to Overcome Cheadle's Prima Facie Showing the E-mail and Letter Were Confidential Attorney-Client Communications

Cheadle contends he made a prima facie showing the e-mail and letter were confidential attorney-client communications between Obarr and Kimes, and the trial court then impermissibly reviewed the contents of those communications to rule on Cheadle's privilege claim. Cheadle asserts Pham and the trial court identified no evidence other than the contents of the e-mail and letter to show the communications were not privileged, and therefore Pham failed to overcome Cheadle's prima facie showing and the resulting presumption the communications were privileged. We agree.

"The party claiming the privilege has the burden of establishing the preliminary facts necessary to support its exercise, i.e., a communication made in the course of an attorney-client relationship. [Citations.] Once that party establishes facts necessary to support a prima facie claim of privilege, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish the communication was not confidential or that the privilege does not for other reasons apply." (*Costco*, *supra*, 47 Cal.4th at p. 733; see § 917, subd. (a).)

Here, it is undisputed the e-mail and letter were communications from Kimes to Obarr, and Galla was the only other party to those communications. Cheadle

9

submitted Kimes's declaration explaining Kimes was a licensed attorney who had an ongoing attorney-client relationship with Obarr and represented him on the sale of the Property. Kimes also explained he copied Galla on his communications with Obarr because she was Obarr's assistant and Obarr instructed him to do so. Galla's declaration also acknowledged Kimes was an attorney who represented Obarr on various legal matters and she received communications from Kimes on Obarr's behalf about those matters.[3] As the trial court acknowledged, this evidence satisfied Cheadle's initial burden and gave rise to a presumption the e-mail and letter were confidential, attorney-client communications. (See *Costco*, *supra*, 47 Cal.4th at p. 733 [evidence showed client hired attorney to represent it and therefore attorney's letter to client met prima facie threshold that letter was a privileged communication].)

The trial court found Pham overcame this presumption based on the contents of the e-mail and letter. The court explained its in camera review of the communications revealed they were not privileged because "Mr. Kimes doesn't really provide Mr. Obarr with any advice, counsel, sharing of information, and certainly Mr. Obarr has not provided any information to Mr. Kimes." The court further explained the communications showed they were not privileged because they stated Kimes was not currently representing Obarr in selling the Property, Obarr failed to sign a retainer agreement, and Kimes stated he would refund the unused portion of Obarr's deposit. The trial court, however, erred when it reviewed the contents of the e-mail and letter to determine whether they were privileged attorney-client communications.

As explained above, the fundamental purpose of the attorney-client privilege is to safeguard the confidential relationship between an attorney and a client to

---

[3] Pham does not claim on appeal that copying Galla on Kimes's communications to Obarr excluded them from the attorney-client privilege, and therefore Pham forfeited that issue. (*In re S.C.* (2006) 138 Cal.App.4th 396, 408 [appellant forfeits claim of error by failing to cite authority and provide legal analysis addressing claim].)

10

promote the open discussion of all matters relating to the representation. (*Costco*, *supra*, 47 Cal.4th at p. 732.) The privilege therefore protects the confidential communication or transmission of information between an attorney and a client regardless of whether the information transmitted is otherwise privileged. (*Id*. at pp. 734, 736.) The protection the privilege provides is absolute and prevents the disclosure of any part of a privileged communication regardless of its content or any particularized need for disclosure. (*Kerner*, *supra*, 206 Cal.App.4th at p. 111.)

Consequently, "it is neither customary nor necessary to review the contents of the communication in order to determine whether the [attorney-client] privilege applies." (*Cornish v. Superior Court* (1989) 209 Cal.App.3d 467, 480 (*Cornish*).) A court's determination on whether the privilege applies "does not involve the nature of the communications or the effect of disclosure but rather the existence of the relationship at the time the communication was made, the intent of the client and whether the communication emanates from the client." (*Ibid.*; see *Costco*, *supra*, 47 Cal.4th at p. 739 ["because the privilege protects a *transmission* irrespective of its content, there should be no need to examine the content in order to rule on a claim of privilege"].)

Consistent with these principles, California courts have recognized "we must approach th[e] issue [of whether documents are protected by the attorney-client privilege] without inspection of the documents themselves." (*Cooke v. Superior Court* (1978) 83 Cal.App.3d 582, 588 (*Cooke*); see *State Farm Fire & Casualty Co. v. Superior Court* (1997) 54 Cal.App.4th 625, 640 (*State Farm*) ["We will not take into consideration the actual privileged information in aid of our determination"].) Similarly, the Legislature has prohibited court-ordered disclosure of disputed documents for in camera review to resolve an attorney-client privilege claim. (§ 915, subd. (a); see *Costco*, *supra*, 47 Cal.4th at pp. 736-740.)

The trial court justified its in camera review by citing the *OXY* decision. In *OXY*, the Court of Appeal crafted an exception to section 915 and its prohibition against

11

in camera review when the review is necessary to determine whether there was a waiver of the claimed privileged or whether an exception to the privilege applied. (*OXY*, *supra*, 115 Cal.App.4th at pp. 895-896.)*OXY* is inapposite, however, because the trial court reviewed Kimes's e-mail and letter to determine whether they were privileged, not to determine whether Obarr or Cheadle waived the attorney-client privilege or whether an exception to the privilege applied.

More importantly, this aspect of *OXY* is no longer good law after the Supreme Court's *Costco* decision. In *Costco*, the Court explained the in camera review the *OXY* court ordered was not appropriate because "section 915 prohibits disclosure of information claimed to be privileged in order to determine if a communication is privileged." (*Costco*, *supra*, 47 Cal.4th at p. 740.) The *Costco* court explained, "after the court has determined the privilege is waived or an exception applies generally, the court to protect the claimant's privacy may conduct or order an in camera review of the communication at issue to determine if some protection is warranted notwithstanding the waiver or exception." (*Ibid*.) A review, however, may not be conducted for any reason until the court determines the privilege does not apply or has been waived. (*Ibid*.)

Pham contends the trial court was allowed to review the e-mail and letter because Galla had publicly disclosed the communications when she provided Pham copies of the communications and Pham filed them with the court in opposition to Westminster's summary adjudication motion. According to Pham, "section 915 does not prevent consideration of a privileged communication that has already been disclosed."[4]The argument is meritless.

---

[4] To support this contention, Pham relies on *Roe v. Superior Court* (1991) 229 Cal.App.3d 832, 843, fn. 9. There, the appellate court concluded the trial court did not violate section 915 by ordering disclosure of the allegedly privileged information because the information already had been disclosed by other parties and therefore the court did nothing to force the disclosure. *Roe* is inapposite for two reasons. First, even though the trial court in *Roe* referred to section 915, it did not review any privileged information to determine whether a privilege applied. Second, *Roe* involved the right to

12

As explained above, section 915 prohibits a court from reviewing an allegedly privileged attorney-client communication to determine whether it is privileged because the nature of the attorney-client privilege requires absolute protection for all confidential communications between an attorney and a client regardless of their content. (*Cornish*, *supra*, 209 Cal.App.3d at p. 480; see *Costco*, *supra*, 47 Cal.4th at pp. 734, 736, 739.) Courts have no power to create exceptions to section 915's mandate. (*Costco*, at p. 739.) The court therefore may not review the content of the communication to determine whether it is privileged. It simply does not matter that a third party disclosed the communication. (See *id*. at pp. 737-740; *State Farm*, *supra*, 54 Cal.App.4th at p. 640; *Cooke*, *supra*, 83 Cal.App.3d at p. 588; *Cornish*, at p. 480.)

Moreover, Pham's argument assumes Galla's disclosure to Pham, and Pham's disclosure to the court, were authorized disclosures that waived the privilege and allowed the court to review the communications. The attorney-client privilege, however, may be waived only by the holder of the privilege. (§ 912, subd. (a); *Gionis*, *supra*, 9 Cal.4th at p. 1207.)As relevant here, the holder is the client, a guardian or conservator of the client, or the personal representative of the client if the client is deceased. (§ 953.) Pham points to no evidence in the record showing either Obarr or Cheadle waived the attorney-client privilege as to these or any other communications, or that either of them authorized Galla to waive the privilege by disclosing these communications. The privilege is not waived when the client's agent discloses a privileged communication

privacy. (*Roe*, at p. 843.) The right to privacy provides a party with a qualified protection; it is not an absolute privilege like the attorney-client privilege. (*John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1198-1199.) Case authority expressly authorizes a court to conduct an in camera review to determine whether the party challenging the right to privacy made a sufficiently strong showing of need for the information to overcome the qualified protection the right provides. (See e.g., *Schnabel v. Superior Court* (1993) 5 Cal.4th 704, 714; *Babcock v. Superior Court* (1994) 29 Cal.App.4th 721, 727-728.)

without the client's authorization. (*State Comp. Ins. Fund v. WPS, Inc.*(1999) 70 Cal.App.4th 644, 652-654 (*State Fund*) [no waiver of attorney-client privilege when attorney inadvertently and without client's authorization disclosed otherwise privileged communications because client did not intentionally or voluntarily relinquishknown right].)

The trial court therefore was not permitted to review the contents of the e-mail and letter, and the court's ruling they were not privileged attorney-client communications must stand or fall based on other evidence in the record. Pham, however, points to no other evidence showing the e-mail and letter were not confidential communications between an attorney and a client made during the course of the attorney-client relationship. In contrast, prima facie evidence supports the existence of an attorney-client relationship between Kimes and Obarr.

Other than her summary of the e-mail and letter, nothing in Galla's declaration definitively shows Kimes did not represent Obarr regarding the Property's sale. Moreover,Galla's declaration acknowledged Kimes represented Obarr on a number of legal matters, and therefore acknowledged an attorney-client relationship existed between Obarr and Kimes. Galla's declaration also attached an April 2013 letter from Kimes to John Defalco, stating Kimes represented Obarr on the Property's sale and Obarr instructed him to contact Defalco to inquire whether he would match the current offer to purchase the Property. Galla and Pham do not address this letter. Thus, Pham failed to overcome Cheadle's prima facie showing and the presumption the communications were privileged.[5]

---

[5] We express no opinion on whether the contents of the e-mail and letter constitute substantial evidence sufficient to support the trial court's ruling because we may not properly consider that information.

14

3. No Statutory Exception to the Attorney-Client Privilege Excludes the E-mail and Letter from the Privilege's Protection

Cheadle contends the trial court erred in ruling the statutory exceptions to the attorney-client privilege established by sections 957, 960, and 961 excluded the e-mail and letter from protection. We agree.

a. *Section 957's Exception for Parties Claiming Througha Deceased Client*

Section 957 provides the attorney-client privilege does not apply "to a communication relevant to an issue between parties all of whom claim through a deceased client, regardless of whether the claims are by testate or intestate succession, nonprobate transfer, or inter vivos transaction." Pham contends this exception applies because both it and Westminster claim to be owners of the Property through separate inter vivos transactionswith Obarr, and the communications between Obarr and Kimes are relevant to whether Obarr intended to sell the Property to SCD (and therefore Westminster) or Pham.[6] In contrast, Cheadle contends this exception does not apply based on the statutory requirement the communications must be relevant to an issue between "'parties all of whom claim through a deceased client.'" According to Cheadle, Westminster and Pham make claims *against* rather than through Obarr because they both seek monetary damages against Obarr's estate.

There is no California case law interpreting section 957's relevant language, but the Law Revision Commission Comments concerning the statute's original

---

[6] In addition to the statutory language extending this exception to parties who claim through a deceased client by inter vivos transaction, Pham also relies on the language applying the exception to parties who claim through a deceased client by nonprobate transfer. The inter vivos transaction language is the relevant language here because both Westminster and Pham claim through contracts or deeds Obarr allegedly executed to sell or transfer the Property during his lifetime. A nonprobate transfer occurs upon death, but outside the probate context, such as through a trust. (See generally *Estate of Gardner* (2010) 187 Cal.App.4th 543, 549.) The alleged transfers to Westminster and Pham do not qualify as nonprobate transfers.

15

enactment in 1965 explain the underlying rationale for this exception: "Th[is] traditional exception [to the attorney-client privilege] . . . is based on the theory that claimants in privity with the estate claim *through* the client, *not adversely*, and the deceased client presumably would want his communications disclosed in litigation between such claimants so that his desires in regard to the disposition of his estate might be correctly ascertained and carried out."(Cal. Law Revision Com. com. 29B Pt. 3A, West's Ann. Evid. Code (2009 ed.) foll. § 957, p. 387, second italics added.)[7]

In 2009, the Law Revision Commission again examined this exception when the Legislature directed the Commission to study application of the attorney-client privilege after a client's death. (Recommendation: Attorney-Client Privilege After Client's Death (Feb. 2009) 38 Cal. Law Revision Com. Rep. (2008) p. 166.) In recommending the Legislature clarify that this exception applies to nonprobate transfers, the Commission further explained the exception's purpose and application: "The exception is based on the assumption that a decedent would have wanted the attorney-client communication disclosed in litigation between the decedent's beneficiaries (as opposed to litigation in which a third party, such as a creditor, claims against the decedent). Such disclosure helps to ensure the client's intent regarding disposition of the client's assets 'might be correctly ascertained and carried out.'" (*Id*. at p. 196, fn. omitted; see*Fletcher v. Superior Court* (1996) 44 Cal.App.4th 773, 779, quoting *Clark v. Second Judicial Dist. Court* (1985) 101 Nev. 58, 62 ["""in a suit between devisees under a will, statements made by the deceased to counsel respecting the execution of the will, or other similar document, are not privileged. While such communications might be privileged, if offered by third persons to establish claims

---

[7]    "'Explanatory comments by a law revision commission are persuasive evidence of the intent of the Legislature in subsequently enacting its recommendations into law.'" (*Donkin v. Donkin* (2013) 58 Cal.4th 412, 424, fn. 8.)

against an estate, they are not within the reason of the rule requiring their exclusion, when the contest is between the heirs or next of kin"'"" (italics omitted)].)

This case presents a hybrid situation involving claims both through and against the deceased client and his estate. Westminster and Pham each claim title to the Property through Obarr based on separate inter vivos transactions with Obarr, but both also assert adverse claims against Obarr's estate seeking monetary damages based on Obarr's contract to sell the Property to the other buyer. Westminster's complaint alleged claims against Obarr's estate for specific performance, breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief. It seeks monetary damages and attorney fees against the estate even if Westminster succeeds on the specific performance claim. Pham's cross-complaint similarly alleged claims against Obarr's estate for specific performance, breach of contract, intentional interference with contract, breach of the implied covenant of good faith and fair dealing, declaratory relief, and constructive trust. It too seeks monetary damages and attorney fees against Obarr's estate even if Pham succeeds on the specific performance claim.

Based on these adverse claims seeking affirmative relief against Obarr's estate beyond simply resolving to whom he intended to sell the Property, we conclude section 957's exception to the attorney-client privilege does not apply here. If the otherwise privileged communications between Obarr and Kimes are not protected by the privilege, then the parties will use the communications both to identify to whom Obarr intended to sell the Property and to establish a claim for damages against Obarr's estate. For example, if one of the communications showed Obarr intended to sell the Property to SCD (and therefore Westminster), then Pham would use that communication to show Obarr's estate was liable for inducing Pham to purchase the Property after Obarr already had sold it. That result is inconsistent with the exception's purpose.

As explained above, the Legislature's based this exception on the reasonable assumption the deceased client would want privileged communications

17

disclosed to ensure distribution of the client's estate was consistent with the client's wishes. In that context, the court is confronted with gifts of property that would not result in potential liability for the deceased client's estate. Unlike here, that situation does not involve a sale of property that may result in liability for the deceased client's estate.

In codifying the exception, the Legislature expanded it to include inter vivos transactions in addition to transfers through testate or intestate succession because a deceased client presumably would want his assets distributed according to his wishes regardless of whether the transfers were made through an inter vivos transaction or either testate or intestate succession. The legislative history, however, demonstrates the Legislature did not intend the expanded exception to apply in cases involving claims against the deceased client's estate based on inter vivos transactions.

The underlying rationale for section 957 does not apply to claims against the deceased's estate because it does not necessarily follow that a client would want his or her privileged communications disclosed when disclosure may expose the estate to liability. Moreover, when, as here, there are allegedly two arm's length transactions involving the sale of property, as opposed to a gift of property, the client does not have the same interest in ensuring a particular party receives the property. The client may want to see the property go to the buyer willing to pay the highest price, but the client is not necessarily willing to expose his estate to liability to ensure that outcome.

Of course, a deceased client's personal representative could waive the attorney-client privilege for certain communications if the representative determines doing so would be in the best interest of the client's estate. (§§ 912, 953 [decease client's personal representative is holder of privilege with standing to waive it].) That waiver, however, would be made during the litigation based on a careful determination of whether disclosing a particular communication would serve the client's best interest. In contrast, applying the exception in this situation would result in a wholesale exclusion of

18

an entire category of communications from the attorney-client privilege without any analysis or consideration of whether doing so would serve the client's best interests or ensure the client's wishes were carried out. The underlying rationale for the exception does not support its application in this situation.

b. *ExceptionsUnder Sections 960 and 961 for a Deceased Client's Intention Regarding a Writing Affecting a Property Interest or the Validity of a Writing*

Section 960 and 961 establish two related exceptions to the attorney-client privilege concerning a deceased client's writing affecting an interest in property. Section 960 provides the privilege does not apply to "a communication relevant to an issue concerning the intention of a client, now deceased, with respect to a deed of conveyance, will, or other writing, executed by the client, purporting to affect an interest in property." Section 961 states the privilege does not apply to "a communication relevant to an issue concerning the validity of a deed of conveyance, will, or other writing, executed by a client, now deceased, purporting to affect an interest in property."

As with section 957's exception, there is no case law construing the language of these statutes, but the joint Law Revision Commission Comments explain the intended purpose and scope of these exceptions: "Although the attesting witness exception stated in Section 959 is limited to information of the kind to which one would expect an attesting witness to testify, there is merit to having an exception that applies to all dispositive instruments. A client ordinarily would desire his lawyer to communicate his true intention with regard to a dispositive instrument if the instrument itself leaves the matter in doubt and the client is deceased. Likewise, the client ordinarily would desire his attorney to testify to communications relevant to the validity of such instruments after the client dies. Accordingly, two additional exceptions—Sections 960 and 961—are provided for this purpose. These exceptions have been recognized by the California decisions only

19

in cases where the lawyer is an attesting witness."[8](Cal. Law Revision Com. com. 29B Pt. 3A, West's Ann. Evid. Code (2009 ed.) foll. § 960, p. 394.)

This comment reveals the purpose of these exceptions is to allow an attorney to provide testimony about a client's intention regarding any instrument affecting an interest in property in the same way the exception codified in section 959 allows an attorney to testify about a client's intention about an attested document on which the attorney served as an attesting witness. The Law Revision Commission Comments to section 959 make clear this narrow exception is limited to the types of communications to which an ordinary attesting witness would testify, rather than a wholesale exception for all communications concerning the attested document or related transaction: "This exception relates to the type of communication about which an attesting witness would testify. The mere fact that an attorney acts as an attesting witness should not destroy the lawyer-client privilege as to all statements made concerning the document attested; but the privilege should not prohibit the lawyer from performing the duties expected of an attesting witness." (Cal. Law Revision Com. com. 29B Pt. 3A, West's Ann. Evid. Code (2009 ed.) foll. § 959, p. 392.)

Based on the Comments of the Law Revision Commission, we conclude the exceptions do not apply to Kimes's e-mail and letter to Obarr because there is no showing those communications are the type of communications about which an attesting witness would testify. The e-mail is dated September 2012, and the letter is dated January 2013, but Obarr did not allegedly enter into the purchase agreement with SCD until March 2013, or the purchase agreement with Pham until April 2013. At most, the e-mail and letter therefore would reflect general information about Obarr's intent

---

[8] Section 959 provides the attorney-client privilege does not apply to "a communication relevant to an issue concerning the intention or competence of a client executing an attested document of which the lawyer is an attesting witness, or concerning the execution or attestation of such a document."

20

concerning the Property's sale months before he executed either purchase agreement, rather than the sort of information an attesting witness would have about the purchase agreements and their execution.

Applying these exceptions with the breadth Pham advocates would essentially eliminate the privilege for all communications relating to the underlying transaction or transfer. That is well beyond the intended scope reflected in the foregoing Law Review Commission Comments.

Moreover, Pham contends Kimes had no role in the negotiation and execution of either of the purchase agreements, and therefore Pham made no showing Kimes would have any information about these agreements and their execution. As the party asserting an exception to the attorney-client privilege, Pham bore the burden to show the exception applied. (*Venture Law Group v. Superior Court* (2004) 118 Cal.App.4th 96, 102.)

B.       *Pham Did Not Establish Obarr or Cheadle Waived the Attorney-Client Privilege*

Although the trial court did not rule on its waiver argument, Pham contends we should affirm the trial court's ruling on the ground Obarr and Cheadle waived the attorney-client privilege. Pham posits three separate waiver theories, but fails to adequately support any of them with legal authority, argument, and evidence.

First, Pham argues Obarr and Cheadle waived the attorney-client privilege because they did not act reasonably and diligently to preserve the privilege. According to Pham, Obarr and Cheadle knew Galla held many of Obarr's privileged documents relevant to this litigation, but they did nothing to recover those documents and preserve the privilege until Pham obtained copies from Galla and filed them with the court. Pham cites no authority establishing a client waives the privilege by failing to retrieve his or her privileged documents from an agent entrusted with them. Pham therefore forfeited this

21

argument by failing to adequately support it with argument and relevant legal authority. (*In re S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

Second, Pham claims Obarr waived the privilege by freely authorizing Galla and others to share communications about the Property's sale with third parties. As an example, Pham contends the evidence showed Galla sent the January 2014 letter at issue to the escrow company for Westminster's purchase of the Property.Pham's record citation, however, is to one of its opposition briefs rather than to any evidence in the record.An exhibit to that brief appears to be an e-mail from Galla to the escrow company, but there is no declaration or other testimony to authenticate or otherwise explain the e-mail, and Pham therefore forfeited this claim as well. (*Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 956 [failure to citesupporting evidence in record forfeits claim].)

Finally, Pham contends Obarr waived the privilege by "put[ting] matters at issue that are contained in allegedly privileged documents."Although fundamental fairness may require disclosure of privileged information when a plaintiff places in issue a communication that "goes to the heart of the claim in controversy" (*Mitchell v. Superior Court* (1984) 37 Cal.3d 591, 604), Pham made no showing and provided no argument on how the e-mail and letter shed light on any matter that Obarr or Cheadle placed in issue. It is difficult to see how Pham could prevail on this argument because Westminster and Pham are the parties who initiated this case against Obarr. In any event, Pham forfeited the claim by failing to provide any analysis or support for it. (*In re S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

C.      T*he Trial Court Must Decide the Disqualification Issue*

Cheadle contends we must disqualify Pham's counsel because he improperly obtained Obarr's attorney-client privileged communications from Galla, carefully reviewed and analyzed the communications, and used them to oppose

22

Westminster's summary adjudication motion without notifying Cheadle and giving him an opportunity to prevent disclosure.  We remand for the trial court to decide the disqualification issue because the court never resolved the matter based on its conclusion the e-mail and letter were not privileged.  As we explain, this issue is vested in the trial court's sound discretion in the first instance.

"'Protecting the confidentiality of communications between attorney and client is fundamental to our legal system. The attorney-client privilege is a hallmark of our jurisprudence that furthers the public policy of ensuring "'the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense.'"'" (*Clark v. Superior Court* (2011) 196 Cal.App.4th 37, 48 (*Clark*).)  To protect the sanctity of the privilege and to discourage unprofessional conduct, an attorney has an ethical obligation to protect an opponent's privileged and confidential information, and those of third parties, when the attorney receives the information without a waiver from the holder of the privilege.  (*Ibid*.)

Specifically, "[w]hen a lawyer who receives materials that obviously appear to be subject to an attorney-client privilege or otherwise clearly appear to be confidential and privileged and where it is reasonably apparent that the materials were provided or made available through inadvertence, the lawyer receiving such materials should refrain from examining the materials any more than is essential to ascertain if the materials are privileged, and shall immediately notify the sender that he or she possesses material that appears to be privileged. The parties may then proceed to resolve the situation by agreement or may resort to the court for guidance with the benefit of protective orders and other judicial intervention as may be justified. . . .  [W]henever a lawyer ascertains that he or she may have privileged attorney-client material that was inadvertently provided by another, that lawyer must notify the party entitled to the

23

privilege of that fact." (*State Comp.*, *supra*, 70 Cal.App.4th at pp. 656-657; see *Rico v. Mitsubishi Motors Corp.* (2007) 42 Cal.4th 807, 817-818 (*Rico*).)

This so-called "*State Fund* rule" establishes an objective standard that "holds attorneys to a reasonable standard of professional conduct when confidential or privileged materials are inadvertently disclosed." (*Rico*, *supra*, 42 Cal.4th at p. 818.) "In applying the rule, courts must consider whether reasonably competent counsel, knowing the circumstances of the litigation, would have concluded the materials were privileged, how much review was reasonably necessary to draw that conclusion, and when counsel's examination should have ended." (*Ibid*.)

The failure to comply with these obligations may justify counsel's disqualification, but does not automatically require it. (*Rico*, *supra*, 42 Cal.4th at p. 819; *State Fund*, *supra*, 70 Cal.App.4th at p. 657.) "'"[M]ere exposure"' to an adversary's confidences is insufficient, standing alone, to warrant an attorney's disqualification." (*Rico*, at p. 819; see *State Fund*, at p. 657)Instead, the court must consider the totality of the circumstances surrounding the receipt, review, use, and impact of the disclosed privileged information, with "'the means and sources of breaches of the attorney-client confidentiality . . . be[ing] important considerations.'" (*State Fund*, at p. 657; see *Rico*, at p. 819.)

"A disqualification motion involves a conflict between a client's right to counsel of his or her choice, on the one hand, and the need to maintain ethical standards of professional responsibility, on the other. [Citation.] Although disqualification necessarily impinges on a litigant's right to counsel of his or her choice, the decision on a disqualification motion 'involves more than just the interests of the parties.' [Citation.] When ruling on a disqualification motion, '[t]he paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect

24

the fundamental principles of our judicial process.'" (*Clark*, *supra*, 196 Cal.App.4th at pp. 47-48.)

A motion to disqualify counsel is vested in the sound discretion of the trial court and we review the court's ruling under the deferential abuse of discretion standard. "'In exercising its discretion, the trial court must make a reasoned judgment that complies with applicable legal principles and policies.' [Citations.] 'The order is subject to reversal only when there is no reasonable basis for the trial court's decision.'" (*Clark*, *supra*, 196 Cal.App.4th at p. 46.)

Here, the trial court never undertook the careful balancing of competing interests required to determine Cheadle's request to disqualify Pham's counsel because the trial court concluded the e-mail and letter were not privileged, and therefore no basis for disqualifying Pham's counsel existed. As explained above, the trial court erred in concluding the e-mail and letter were not privileged attorney-client communications. The foregoing standards regarding the inadvertent disclosure of these privileged communications apply because there was no showing either Obarr or Cheadle intended to disclose these communications to Pham or anyone else.

We decline to decide the disqualification issue, and instead remand for the experienced trial judge to determine the issue based upon her superior knowledge of the underlying facts and the impact of this disclosure on the case. In doing so, the trial court should not consider any information it acquired from its review of the e-mail and letter. Rather, the court should limit itself to nonprivileged information it received from the parties about the communications and their impact on the action. Nothing about the attorney-client privilege, however, prevents the court from considering, or requiring disclosure of, any information not derived from an examination of the privileged communications, such as facts relating to who holds the privilege, whether an attorney-client relationship existed at the time of the communications, and whether the client intended the communication to be confidential. (See *Costco*, *supra*, 47 Cal.4th at p. 737.)

25

For example, Galla may testify about the circumstances surrounding the communications and the attorney-client relationship between Obarr and Kimes provided she has personal knowledge of these facts and does not disclose any privileged information or any information she gained from reviewing a privileged communication. Of course, as the holder of the attorney-client privilege, Cheadle may ask the court to conduct an in camera review of the communications (or consider the communications in deciding the disqualification issue) if he believes it is necessary for a proper determination of that issue. (See *id*. at pp. 738-740.) By providing this guidance and remanding the matter to the trial court, we express no opinion concerning whether the facts and circumstances surrounding the disclosure and use of the e-mail and letter warrant disqualification in this case.

III

DISPOSITION

The order is reversed and remanded for further proceedings consistent with this opinion. Cheadle shall recover his costs on appeal.


ARONSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


BEDSWORTH, J.

26