[No. B112133. Second Dist.,. Div. Four. Mar. 4, 1999.]

STATE COMPENSATION INSURANCE FUND, Plaintiff and
Respondent, v.
WPS, INC., Defendant and Appellant;
ADAM J. TELANOFF et al., Objectors and Appellants.

## COUNSEL

Telanoff & Telanoff and Adam J. Telanoff, in pro. per., for Defendant and Appellant and for Objectors and Appellants.

Ronald M. Telanoff, in pro. per., for Objector and Appellant.

Barger & Wolen, Richard de Saint Phalle, John C. Holmes, Ethan A. Miller, Andrew S. Williams; Charles W. Savage; Richard A. Krimen; and Isabel Lallana for Plaintiff and Respondent.

## OPINION

**VOGEL (C. S.), P. J.—**

### INTRODUCTION

Adam J. Telanoff, counsel for WPS, Inc., received copies of State Compensation Insurance Fund's (State Fund) internal documents containing privileged attorney-client communications because State Fund's outside lawyers inadvertently sent them along with other documents produced for use at trial. Adam Telanoff gave some of the privileged documents to an expert witness he consulted for the WPS matter. The expert witness then provided those documents to another lawyer who was adverse to and pursuing a different claim against State Fund. When State Fund's counsel discovered the error and requested that the documents be returned, Adam Telanoff refused. The trial court found that such conduct was in bad faith and contrary to the ethical standards governing the legal profession. Accordingly, the trial court imposed monetary sanctions against appellants WPS, Inc., Telanoff & Telanoff, Adam Telanoff, and Ronald M. Telanoff, in favor of respondent State Fund pursuant to Code of Civil Procedure section 128.5. Appellants filed this appeal.

Although we agree in principle with the trial court, we vacate the award of sanctions because, as respondent concedes, there is no established California law governing what the obligation of a lawyer is upon receiving obviously privileged materials through the inadvertence of another. However, because it is probable that similar circumstances will reoccur in the ebb and flow of discovery and litigation matters, this opinion provides a standard for future application by lawyers confronted with a predicament comparable to the one presented here.

### FACTUAL AND PROCEDURAL BACKGROUND

In October 1993, National Commercial Recovery, Inc., State Fund's assignee, brought the underlying action against WPS for underpayment of the premium for workers' compensation insurance. WPS was represented by Attorney Adam Telanoff, and the law firm of Telanoff & Telanoff. WPS filed a cross-complaint against State Fund alleging bad faith.

During the litigation, the parties agreed to stipulate to a protective order regarding documents which State Fund deemed to be of a confidential or proprietary nature, whereby such documents were to be placed under seal with the court.

Pursuant to discovery requests propounded by WPS, State Fund produced on April 4, 1996, approximately 7,000 pages of documents.[1] On or about August 23, 1996, approximately four months after the discovery cutoff date, counsel for State Fund sent to the offices of Telanoff & Telanoff three boxes of documents, which were the same documents originally produced during discovery. In addition, 273 pages of "Civil Litigation Claims Summary" forms prepared by employees of State Fund were erroneously included with those previously produced documents. The heading at the top of each claim summary form reads: "ATTORNEY-CLIENT COMMUNICATION/ATTORNEY WORK PRODUCT," followed by: "DO NOT CIRCULATE OR DUPLICATE," and "(*Complete and Return to SCIF Civil Litigation Center*)." The word "CONFIDENTIAL" is repeatedly printed around the perimeter of the first page of the form. All of the pages of documents, including the "Civil Litigation Claims Summary" documents, were sequentially numbered.

After Adam Telanoff received the boxes of documents, in his words, he "called Ethan Miller, counsel for [State Fund] and asked what the boxes were. Mr. Miller told me that they were documents for use at trial."

The underlying matter was tried by a jury, resulting in a verdict in favor of State Fund in December 1996.

---

[1]The discovery cutoff date was April 20, 1996 (although discovery was later reopened in December 1996 when the trial date was rescheduled).

On December 19, 1996, the law firm of Sheppard, Mullin, Richter & Hampton, counsel for State Fund in a separate case pending in the Los Angeles Superior Court entitled Bonded Motors & Parts, Inc. v. State Comp. Ins. Fund (Super. Ct. L.A. County, No. BC082618) received from opposing counsel a request for production of the claim summary forms at issue here. The request for production had attached as an exemplar a civil litigation claims summary form pertaining to WPS.

On December 20, 1996, counsel for State Fund in the present matter received a copy of the claim summary attached as an exemplar to the request for production of documents in the Bonded Motors case. The exemplar claim summary bore Bates stamp numbers "SC/WP006606," "SC/WP006607," "SC/WP006600," "SC/WP006603," "SC/WP006604," and "SC/WP006605," which corresponded to the Bates stamp numbers on the documents received by Telanoff & Telanoff on August 23, 1996.

On December 23, 1996, State Fund's counsel, Ethan Miller, contacted Adam Telanoff and demanded the return of the "Civil Litigation Claims Summary" documents. Telanoff refused. Miller then gave Telanoff ex parte notice that he would appear and seek an order to compel return of the documents.

State Fund filed a memorandum of points and authorities in support of its ex parte application for an order (1) to show cause why appellants should not be held in contempt for violating a protective order, (2) compelling destruction or return of the documents, and (3) for sanctions against WPS and Adam Telanoff.

At the hearing on December 30, 1996, the trial court made the preliminary finding that State Fund had "made a *prima facie* showing that it has suffered or may in future suffer irreparable injury consisting in the dissemination to one or more third parties of one or more 'Civil Litigation Claims Summary' forms apparently intended by State Fund as a means of confidential communication between its [claims department and its in house lawyers], assuming, *arguendo*, the attorney-client privilege has not been waived[.] [¶] . . . Good cause exists to warrant a preliminary determination that either WPS . . . Adam Telanoff or Ronald Telanoff, both of whom are counsel of record for WPS in the matter at bench, (1) have certain privileged Fund documents in their possession, custody or control, and (2) have knowledge of facts relevant to the question of how, when, in what manner and for what consideration, if any, the [claims summary] . . . came into the hands of counsel for plaintiff in the *Bonded Motors* action." Appellants filed written opposition, which included the declaration of Adam Telanoff.

At that hearing, the trial court indicated that it did not find that the protective order stipulated to by the parties had been violated by counsel for WPS, and that the court was not inclined to consider the matter as a contempt proceeding. However, the court deferred its decision regarding sanctions and the court ordered that evidence would be taken and argument heard on January 17, 1997.

The court received testimony from numerous individuals. Isabel Lallana, in-house counsel for State Fund, testified that the claim summary forms were created by her and others to identify litigation issues as they relate to the facts in a claim form, and to identify issues the legal department would like to know from the claims department. The forms would be shown to management within State Fund and to outside cocounsel to facilitate their understanding of the strengths and weaknesses of cases. Ms. Lallana and others in the legal department would send the forms to State Fund assistant claims managers as part of State Fund's investigative process when bad faith litigation was commenced against it; when completed the forms became part of the legal department's litigation file. She had sent the claims summary forms to outside cocounsel Victor Rosenblatt of Buchalter, Nemer, Fields & Younger with the intent that they be used as part of the litigation investigative process. She also forwarded to the Buchalter firm a large volume of documents from State Fund's claims files, for use in responding to WPS's request for production of documents.

Victor Rosenblatt, the attorney responsible for the initial document production, testified that he reviewed the documents sent to him by Ms. Lallana in order to identify privileged documents and mark them as confidential. He had numerous conversations with Ms. Lallana regarding the document production.

Ethan Miller, the attorney responsible for sending the three boxes of documents which contained the claim summary forms at issue here, testified that the content of the documents was intended to be identical to the documents previously sent, with the addition of Bates stamp numbers to facilitate reference to the documents at trial. He testified that he had personally reviewed the documents and was assisted in doing so by a paralegal to ensure they were identical to the documents previously produced. Nonetheless, he overlooked the presence of the claim summary forms. He did not intend to produce the forms to counsel for WPS.

State Fund's counsel used yellow coding sheets to identify privileged documents, and listed each document believed to be privileged on a log produced to WPS. However, the privilege log prepared by counsel for State Fund did not identify the claim summary forms.

H. Samuel Smith, retained by WPS as an expert witness in the underlying matter, was given portions of the claims summary forms by Adam Telanoff about two weeks before trial. Mr. Smith had not seen such forms before, which "piqued" his interest. He thereafter sent the forms by facsimile to Roxborough, Pomerance and Gallegos, indicating it was a form he had not seen before. At that time Smith was retained by the Roxborough firm in other matters against State Fund.

Ronald Telanoff testified that he had no discussions with anyone regarding the privileged documents prior to Adam Telanoff's showing him the moving papers in the current matter. He filed a declaration stating as follows: "Other than information provided to me over approximately the last three weeks I know nothing about those certain documents titled 'Civil Litigation Claims Evaluation' . . . [and] I have no personal knowledge of the documents. I have never seen any of the documents in question, except for one such document attached to papers which I have been informed were filed by [State Fund] in connection with the instant motion."

On May 2, 1997, the trial court entered its order, stating that the documents at issue were privileged, were inadvertently produced, and the production did not waive the privilege. The court further found that "counsel for WPS, Inc. failed and refused to return the above-referenced documents to State Fund in violation of counsel's ethical obligations and in violation of ABA Formal Opinion 92-368." The court ordered that, pursuant to Code of Civil Procedure section 128.5 sanctions in the amount of $6,070, be imposed jointly and severally against the firm of Telanoff & Telanoff; Adam J. Telanoff, Esq., Ronald M. Telanoff, Esq. and Defendant WPS, Inc., payable forthwith.

## DISCUSSION

The primary question presented by this appeal is what is a lawyer to do when he or she receives through the inadvertence of opposing counsel documents plainly subject to the attorney-client privilege? Stated differently, what is the ethical duty of a lawyer admitted to the practice of law by the State Bar of California in the circumstance presented here? ▮▮ Before answering the abstract question posed, we must first consider the predicate issues of whether the documents here did in fact contain patently privileged information, and whether the inadvertent disclosure of the documents resulted in a waiver of the attorney-client privilege that would excuse any use of the documents by the receiving attorney.

I. *The Documents Contained Privileged Information.*

The trial court found that the claim summary forms contained privileged information which respondent was not obligated to disclose and which could

remain confidential. Based on testimony from State Fund's in-house counsel it clearly appeared that the forms contained confidential communications between State Fund and its in-house counsel. (Evid. Code, §§ 952, 954.) The forms were disclosed only to outside counsel retained to assist and represent State Fund in litigation. Under the circumstances presented here, we will not disturb the trial court's finding that the documents were subject to the attorney-client privilege. Appellants' argument that the facts contained in the communication might be subject to disclosure does not change the conclusion that the claim summaries were prepared in the course of the attorney-client relationship between State Fund and its counsel. As such, they are privileged communications.

## II. *No Waiver of the Privilege May Be Found by the Inadvertent Disclosure of the Claim Summary Forms.*

Evidence Code section 912, subdivision (a) provides that ". . . the right of any person to claim a privilege provided by Section 954 (lawyer-client privilege) . . . is waived with respect to a communication protected by such privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to such disclosure made by anyone. Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure, including failure to claim the privilege in any proceeding in which the holder has the legal standing and opportunity to claim the privilege."

The statute clearly provides that it is the holder of the privilege, in this case the client State Fund (Evid. Code, § 953), who may waive the privilege, either by disclosing a significant part of the communication or by manifesting through words or conduct consent that the communication may be disclosed by another. The language of the statute indicates that we are to look to the words and conduct of the holder of the privilege to determine whether a waiver has occurred. In this case, it is clear that State Fund did not itself disclose to appellants the claim summaries, but rather its counsel effected the inadvertent disclosure. ▮▮▮ We therefore focus on whether any statement or conduct of State Fund indicates that it consented to counsel's disclosure.[2]

A trial court called upon to determine whether inadvertent disclosure of privileged information constitutes waiver of the privilege must examine both

---

[2]"Courts faced with the issue of whether intent is necessary to effectuate a waiver of the attorney-client privilege by inadvertent disclosure have approached the problem in one of three ways. Some courts have followed a 'strict responsibility' approach, viewing the client's intent as irrelevant.[18] [Fn. 18:] *See, e.g., In re* Grand Jury Investigation of Ocean Transp., 604 F.2d 672, 675 (D.C. Cir. 1979) (privilege was waived when a defendant failed to mark documents as privileged, voluntarily turned them over, and explicitly advised plaintiff that

the subjective intent of the holder of the privilege and the relevant surrounding circumstances for any manifestation of the holder's consent to disclose the information. (See discussion in Ayres, *Attorney-Client Privilege: The Necessity of Intent to Waive the Privilege in Inadvertent Disclosure Cases, supra,* 18 Pacific L.J. 59.)

▄ The trial court in this case heard testimony from in-house counsel for State Fund that there was no intent on her part to ever disclose the claim summary forms, but rather they were to be used strictly to facilitate communication between the State Fund assistant claims managers and in-house counsel and to be shared with outside counsel retained to assist with litigation. The forms themselves were designed to make clear to even a casual observer that they were intended to be confidential attorney-client communications. In addition, attorneys from the Buchalter firm testified that they followed specific procedures designed to ensure that no privileged documents were produced to opposing counsel, including careful review of the documents and maintenance of a privilege log. Attorney Miller testified that the disclosure of the claim summary forms was entirely unintentional. Also, the promptness with which counsel for State Fund moved to secure return of the documents indicated that there was no intent on the part of State Fund to waive the privilege. It is clearly demonstrated that State Fund had no intention to voluntarily relinquish a known right. (*Platt Pacific, Inc.* v. *Andelson* (1993) 6 Cal.4th 307, 315 [24 Cal.Rptr.2d 597, 862 P.2d 158]; see also *Mendenhall* v. *Barber-Greene Co.* (N.D.Ill. 1982) 531 F.Supp. 951, 955.)

---

other documents were intended to be disclosed and not regarded as privileged); Underwater Storage, Inc. v. United States Rubber Co., 314 F. Supp. 546, 549 (D.D.C. 1970) (former attorney of the plaintiff ordered to answer questions concerning a privileged letter). [End of fn. 18.] Other courts have used a balancing approach. [Fn. 19 omitted.] Under the balancing approach, several objective factors may be considered in rendering a decision.[20] [Fn. 20:] *See, e.g.,* Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 104 F.R.D. 103, 105 (S.D.N.Y. 1985) (documents of defendant inspected by plaintiff during discovery were still privileged since precautions of defendant were barely sufficient); *Suburban Sew 'N Sweep[, Inc.* v. *Swiss-Bernina, Inc.*], 91 F.R.D. [254,] 260-[2]61 [(N.D.Ill. 1981)] (privilege waived since defendant did not take sufficient precautions to protect confidentiality from plaintiffs). [End of fn. 20.] A third group of courts has focused specifically upon whether the client intended to waive the privilege.[21] [Fn. 21:] *See, e.g.,* Mendenhall v. Barber-Greene Co., 531 F.Supp. 951, 955 (N.D. Ill. 1982) (no waiver occurred when plaintiff's attorney unintentionally provided privileged documents to defendant's attorney, but later refused to turn over copies of the documents); Connecticut Mut. Life Ins. Co. v. Shields, 18 F.R.D. 448, 451 (S.D.N.Y. 1954) (no waiver occurred when plaintiffs were allowed to inspect privileged documents belonging to defendant, absent evidence that defendant intended to waive the privilege). [End of fn. 21.] Regardless of the approach used, the final determination of whether an assertion of the attorney-client privilege will be upheld in an inadvertent disclosure context depends upon whether the client either expressly or impliedly waived the privilege." (Ayres, *Attorney-Client Privilege: The Necessity of Intent to Waive the Privilege in Inadvertent Disclosure Cases* (1986) 18 Pacific L.J. 59, 60-61.)

Based on the language of Evidence Code section 912, we hold that "waiver" does not include accidental, inadvertent disclosure of privileged information by the attorney. (See *O'Mary* v. *Mitsubishi Electronics America, Inc.* (1997) 59 Cal.App.4th 563, 577 [69 Cal.Rptr.2d 389] ["[Plaintiff] invites us to adopt a 'gotcha' theory of waiver, in which an underling's slip-up in a document production becomes the equivalent of actual consent. We decline. The substance of an inadvertent disclosure under such circumstances demonstrates that there was no voluntary release."].)

III. *Sanctions Were Not Properly Awarded Because Adam Telanoff's Conduct Was Not Clearly Proscribed by the Law of This State.*

■ An award of sanctions under Code of Civil Procedure section 128.5 is a discretionary act on the part of the trial court. (*Tenderloin Housing Clinic, Inc.* v. *Sparks* (1992) 8 Cal.App.4th 299, 304 [10 Cal.Rptr.2d 371].) Under section 128.5, trial courts have broad power to impose monetary sanctions for "bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay." The trial court must abuse the broad discretion accorded it by the Legislature to justify our interference with a sanction award. (*Luke* v. *Baldwin-United Corp.* (1985) 167 Cal.App.3d 664, 668-669 [213 Cal.Rptr. 654].) A trial court's exercise of discretion will be disturbed only for clear abuse. (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].) ■ We conclude the sanctions awarded by the trial court in this unusual set of circumstance were not justified, for reasons which we now explain.[3]

Appellants contend that the case of *Aerojet-General Corp.* v. *Transport Indemnity Ins., supra,* 18 Cal.App.4th 996, is substantially similar to the one before us and compels a reversal of the sanction order. The *Aerojet* decision is not useful in determining the outcome of the case before us. In *Aerojet*, during a stay in discovery in a lawsuit brought by Aerojet against its liability insurers, Attorney DeVries received a packet of documents concerning the litigation from an Aerojet employee. Within those documents, DeVries was interested in a memorandum revealing the existence of a witness who would have knowledge about matters involved in the lawsuit. The memorandum was on plain paper and was identified as a memorandum to the Aerojet file from "RAC." (*Id.* at p. 1003.) After the discovery stay was lifted, DeVries took the witness's deposition. When the insurers later discovered the inadvertent delivery of the documents to DeVries, they brought a motion for

---

[3]Although we characterize this matter as "unusual," we are aware that there are other instances of inadvertent disclosure of privileged documents. (See fn. 2, *ante.*) However, there appears to be no reported California case in which sanctions have been sought against an attorney for using privileged materials which he or she inadvertently received (other than the *Aerojet-General Corp.* v. *Transport Indemnity Insurance* (1993) 18 Cal.App.4th 996 [22 Cal.Rptr.2d 862] case discussed below, which is distinguishable).

sanctions in the trial court, which was granted on the basis that DeVries acted unethically and in bad faith in failing to immediately notify opposing counsel of his receipt of the documents, and in using information contained therein to his own advantage.

The Court of Appeal reversed. Although it acknowledged that the packet of documents at issue contained some privileged information, the court focused on the fact that the information used by DeVries, the existence and identity of a potential witness, was nonprivileged and was subject to discovery. "Consequently, whether the existence and identity of a witness or other nonprivileged information is revealed through formal discovery or inadvertence, the end result is the same: the opposing party is entitled to the use of that witness or information. This fundamental concept was lost in the skirmish below." (*Aerojet-General Corp.* v. *Transport Indemnity Insurance, supra,* 18 Cal.App.4th at p. 1004.) The court further found that the sanctions, awarded under the authority of Code of Civil Procedure, section 128.5, were not justified as the court could not conclude that "deposing a relevant witness constitutes frivolous conduct, in that it is 'totally and completely without merit,' or conduct that is undertaken 'for the sole purpose of harassing an opposing party.'" (18 Cal.App.4th at p. 1005.)

The facts in *Aerojet* are simply very different from those before us. Here, the claim summary forms, which by design and markings are clearly identifiable as containing confidential attorney-client communications, were inadvertently delivered to Telanoff along with other documents previously produced in response to WPS's discovery requests. While the *Aerojet* court found that the insurers had failed to specify how or why they were damaged by the revelation of the documents (18 Cal.App.4th at p. 1003), State Fund demonstrated that a portion of the claim summary forms had been disseminated to another law firm representing a claimant in a different action against State Fund, as evidenced by the Roxborough firm's request for production of the relevant claim summary forms in the Bonded Motors & Parts, Inc. v. State Comp. Ins. Fund, *supra*, No. BC082618 case. Unless preventive measures were taken, State Fund could expect to be regularly subjected to such requests in numerous other cases.

In awarding sanctions against appellants, the trial court in this case relied on the American Bar Association (ABA) Formal Ethics Opinion No. 92-368 (Nov. 10, 1992).[4] However, the ABA Model Rules of Professional Conduct discussed in that opinion do not establish ethical standards in California, as

---

[4]The trial court considered ABA Formal Ethics Opinion No. 92-368 to be binding on appellant. Respondent's counsel sought to question Adam Telanoff "regarding his awareness of the ethical rules and obligations . . . regarding the dissemination of documents that one

they have not been adopted in California and have no legal force of their own. (*General Dynamics Corp.* v. *Superior Court* (1994) 7 Cal.4th 1164, 1190, fn. 6 [32 Cal.Rptr.2d 1, 876 P.2d 487]; *Cho* v. *Superior Court* (1995) 39 Cal.App.4th 113, 121, fn. 2 [45 Cal.Rptr.2d 863].) Rule 1-100(A), paragraph 3 of the California Rules of Professional Conduct provides: "The prohibition of certain conduct in these rules is not exclusive. Members are also bound by applicable law including the State Bar Act (Bus. & Prof. Code, § 6000 et seq.) and opinions of California courts. Although not binding, opinions of ethics committees in California should be consulted by members for guidance on proper professional conduct. Ethics opinions and rules and standards promulgated by other jurisdictions and bar associations may also be considered." Thus, the ABA Model Rules of Professional Conduct *may* be considered as a collateral source, particularly in areas where there is no direct authority in California and there is no conflict with the public policy of California. (See Cal. Compendium on Prof. Responsibility, pt. II, State Bar Formal Opn. No. 1983-71, p. A-223.) However, under the circumstances before us, we conclude that Adam Telanoff should not have been sanctioned for engaging in conduct which has been condemned by an ABA formal opinion, but which has not been condemned by any decision, statute or Rule of Professional Conduct applicable in this state. The finding that an attorney has engaged in conduct contrary to an ABA formal opinion does not establish an obligatory standard of conduct imposed on California lawyers. Consequently it may not perforce be equated to a failure to act in good faith such that sanctions are warranted.

Although ABA Formal Ethics Opinion No. 92-368 is not controlling, its analysis has provided us with guidance in the formulation of a standard for future application to instances similar to that presented here. ■ Accordingly, we hold that the obligation of an attorney receiving privileged documents due to the inadvertence of another is as follows: When a lawyer who receives materials that obviously appear to be subject to an attorney-client privilege or otherwise clearly appear to be confidential and privileged and where it is reasonably apparent that the materials were provided or made available through inadvertence, the lawyer receiving such materials should refrain from examining the materials any more than is essential to ascertain if the materials are privileged, and shall immediately notify the sender that he or she possesses material that appears to be privileged. The parties may then proceed to resolve the situation by agreement or may resort to the court

---

knows or believes to have been inadvertently produced in the matter." The trial court responded that, "since in substance Mr. Telanoff demonstrated before the court . . . that he gave minimal, if any regard, to the ethical issues involved and since whether he knew of them or not they are binding on him, as they are on all of us, I see no reason why he should be examined."

for guidance with the benefit of protective orders and other judicial intervention as may be justified. We do, however, hold that whenever a lawyer ascertains that he or she may have privileged attorney-client material that was inadvertently provided by another, that lawyer must notify the party entitled to the privilege of that fact.

We note that whenever a lawyer seeks to hold another lawyer accountable for misuse of inadvertently received confidential materials, the burden must rest on the complaining lawyer to persuasively demonstrate inadvertence. Otherwise, a lawyer might attempt to gain an advantage over his or her opponent by intentionally sending confidential material and then bringing a motion to disqualify the receiving lawyer. "Mere exposure to the confidences of an adversary does not, standing alone, warrant disqualification. Protecting the integrity of judicial proceedings does not require so draconian a rule. Such a rule would nullify a party's right to representation by chosen counsel any time inadvertence or devious design put an adversary's confidences in an attorney's mailbox. Nonetheless, we consider the means and sources of breaches of attorney-client confidentiality to be important considerations." (*In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 589 [283 Cal.Rptr. 732].) Having so noted, however, we do not rule out the possibility that in an appropriate case, disqualification might be justified if an attorney inadvertently receives confidential materials and fails to conduct himself or herself in the manner specified above, assuming other factors compel disqualification.

The conclusion we reach is fundamentally based on the importance which the attorney-client privilege holds in the jurisprudence of this state. Without it, full disclosure by clients to their counsel would not occur, with the result that the ends of justice would not be properly served. We believe a client should not enter the attorney-client relationship fearful that an inadvertent error by its counsel could result in the waiver of privileged information or the retention of the privileged information by an adversary who might abuse and disseminate the information with impunity. ■ In addition, it has long been recognized that " '[a]n attorney has an obligation not only to protect his client's interests but also to respect the legitimate interests of fellow members of the bar, the judiciary, and the administration of justice.' (*Kirsh* v. *Duryea* (1978) 21 Cal.3d 303, 309 . . . .)" (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 647 [183 Cal.Rptr. 508, 646 P.2d 179].)

In summary, in order to protect the sanctity of the attorney-client privilege and to discourage unprofessional conduct, we have declared the standard governing the conduct of California lawyers confronted by the dilemma presented by this appeal.

## DISPOSITION

The order imposing sanctions against Adam Telanoff, Ronald Telanoff, Telanoff & Telanoff, and WPS, Inc., is reversed. Each party is to bear its own costs on appeal.

Hastings, J., and Curry, J., concurred.