Filed 3/24/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| GUARDIAN STORAGE CENTERS, LLC, et al.,<br><br>    Plaintiffs, Cross-defendants and Appellants,<br><br>                    v.<br><br>JULIE SIMPSON,<br><br>    Defendant, Cross-complainant and Respondent.<br><br>―――――――――――――<br><br>RHIANA DAVIS et al.,<br><br>    Plaintiffs, Cross-defendants and Respondents,<br><br>                    v.<br><br>GUARDIAN STORAGE CENTERS, LLC, et al.,<br><br>    Defendants, Cross-complainants and Appellants. | G064847, G064852<br><br>(Super. Ct. Nos. 30-2023-01356616, 30-2024-01383640)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Nathan R. Scott, Judge. Reversed and remanded with directions.

Burkhalter Kessler Clement & George, Alton G. Burkhalter and M. Michelle Rohani for Appellants.

Aarons Ward, Martin I. Aarons and Shannon H.P. Ward for Respondents.

\*        \*        \*

One of the key facets of the legal profession is the robust and ever-growing set of ethical obligations to which attorneys must adhere. Among those obligations, with which every attorney should be very familiar, is one concerning what an attorney should do if they come into possession of seemingly attorney-client privileged material belonging to another that appears to have been inadvertently transmitted.

These employment related cases require us to determine an attorney's obligations in slightly different circumstances: an attorney receives from their client a seemingly attorney-client privileged email belonging to an opposing party; the email was originally and intentionally sent to the client when the client was an executive employed by the opposing party employer; however, unbeknownst to the employer, the email was subsequently forwarded by the executive employee to their personal email address and, following their termination, provided to their attorney for use in a lawsuit against their former employer.

Appellants Guardian Storage Centers, LLC (Guardian) and John Minar appeal from orders denying disqualification of the law firm representing respondents, Aarons Ward (Aarons), under such circumstances. They contend the trial court abused its discretion by making unsupported factual findings and applying incorrect legal standards in parts of its

2

analysis. From their perspective, the proper analysis compels the conclusion that Aarons should be disqualified because it impermissibly conducted a detailed review of the attorney-client privileged emails, failed to notify Guardian it possessed them, refused to return them upon Guardian's demand, and has indicated its intent to use them against Guardian and related parties in the instant litigation.

We conclude the denial of disqualification was an abuse of discretion under the circumstances. The trial court's finding that the disputed emails are attorney-client privileged, with Guardian being the privilege holder, is supported by substantial evidence, and respondents failed to demonstrate waiver of the privilege. Although the respondents who received the emails were intended recipients at the time they were sent, the court erred in finding this factor favored denying disqualification and, thereby, implicitly rejecting application of the analytical framework set forth in *State Comp. Ins. Fund v. WPS, Inc.* (1999) 70 Cal.App.4th 644 (*State Fund*). We find what has come to be known as the *State Fund* rule, which originated from a situation involving inadvertent disclosure by a party's attorney, equally applicable to a situation in which it is reasonably apparent the privileged material was impermissibly taken from the privilege holder without authorization. Because the trial court did not analyze the circumstances through that proper legal lens, employed too limited a test for determining whether the content of the privileged emails could likely be used to Guardian's disadvantage in the instant litigation, and made an unsupported finding related thereto, we reverse the challenged orders and remand the matter so the court may reconsider Guardian's disqualification motions in accordance with this opinion.

FACTS

Respondents are all former employees of Guardian. At all relevant times, Julie Simpson was Guardian's chief operating officer, Tracie Dotterer was Guardian's chief financial officer, and Rhiana Davis and Gustavo Amezola held other positions. Appellant John Minar was and is Guardian's chief executive officer. He co-owns Guardian along with his son and daughter-in-law, Eric and Claire Minar.[1]

I.

THE SIMPSON ACTION

In October 2023, after terminating Simpson, Guardian and John sued her for, inter alia, breach of contract, breach of fiduciary duty, conversion, and intentional and negligent interference with prospective economic advantage. Among the complaint's allegations were the following: (1) Guardian's employee handbook required Simpson to keep a variety of information confidential, obligated her to return all Guardian property upon termination of employment, and prohibited her from transmitting without authorization any document or email created by or for Guardian; (2) Simpson refused to return a variety of Guardian owned items after her termination, including books, documents, equipment, and data; (3) most of the unreturned information and data is "of a confidential and sensitive nature"; (4) in the couple of months before her termination, Simpson "forwarded 25 company emails to her personal email address"; (5) during her employment, and unbeknownst to Guardian, Simpson used Guardian funds to purchase a

---

[1] Because they share the same last name, we refer to each of the Minars by first name. No disrespect is intended. We sometimes refer to John, Eric, and Claire, collectively, as the Minars.

laptop for her brother and failed to file certain required corporate documents with the relevant government entities; and (6) Simpson owes John over $200,000 in principal and interest pursuant to a loan agreement.

Simpson responded with a cross-complaint against Guardian and John (collectively, with the complaint against Simpson, the Simpson action). Her claim against John alleged he sexually harassed her over the course of 14 years. As for Guardian, Simpson alleged wrongful termination, retaliation, sexual harassment, and failure to prevent retaliation and harassment.

Simpson's cross-complaint detailed a series of events which allegedly occurred in the approximately six-week period before Simpson was terminated. In mid-June 2023, multiple Guardian employees, including Davis, complained to Simpson about "discrimination, harassment, and [a] hostile work environment they had been experiencing" based on the actions of Guardian's then director of operations, Bobby Piccio, and the head of human resources. The employees did not raise the issues with the head of human resources because they felt she would not do anything. That same day, Simpson spoke to the Minars and Dotterer about the allegations. Simpson also emailed them with "suggestions for improvement" after investigating the complaints herself, conveying her belief that the complaints could not be ignored and needed to be rectified. At a subsequent meeting, John purportedly stated "he did not care about the validity of the complaints[] and he wanted [them] to 'go away.'" Thereafter, and in response to an email from Guardian's in-house legal counsel (legal counsel), Simpson sent "a lengthy email" to the Minars, Dotterer, and legal counsel. A few days later, John emailed Simpson, stating her investigation was not authorized or sanctioned by Guardian. Simpson was terminated the following day.

## II.

### THE DOTTERER ACTION

In March 2024, after Guardian terminated Dotterer and Amezola, and Davis was allegedly constructively terminated, the three sued Guardian, John, and Piccio. Among the causes of action were harassment, retaliation, wrongful termination, negligent hiring, supervision, and retention of employees, and failure to prevent harassment and retaliation. The complaint alleged Davis was previously sexually harassed by Piccio when he was her supervisor. After Amezola, Davis's boyfriend, complained to Simpson about the harassment, Guardian terminated Amezola. Thereafter, Davis reported the harassment to Dotterer, who in turn reported the harassment and other complaints received about Guardian's head of human resources to Guardian's third-party payroll company. The payroll company indicated it would conduct its own investigation into the matters. When Dotterer tried to discuss things with John and Eric, including Simpson's termination, they would not speak to her about the situation. Shortly thereafter, Dotterer began receiving accusatory emails and criticism for errors she did not make, some of her responsibilities were removed, and she was not being invited to company meetings. She refused to sign a separation agreement proposed by John and was later terminated.

Guardian and John cross-complained against Dotterer (collectively, with Dotterer's complaint against Guardian and others, the Dotterer action). Their breach of contract, breach of fiduciary duty, and civil conspiracy claims were based on similar allegations to those made against Simpson. Dotterer allegedly forwarded 11 confidential company emails to her personal account in the weeks leading up to Simpson's termination, and she thereafter allegedly forwarded a privileged and confidential internal company

6

email to an unnamed former employee. Unlike in the Simpson action, the Dotterer cross-complaint alleged Dotterer returned Guardian property after receiving a demand letter, but Guardian remained unsure whether Dotterer copied materials before returning them.

## III.

### GUARDIAN'S DISQUALIFICATION MOTIONS[2]

After the filing of the cross-complaints in the Simpson and Dotterer actions, Guardian moved to disqualify the Aarons, which was representing all the former employees in both actions. The motions were based on three emails Simpson produced during discovery which she had previously shared with Aarons (collectively, the emails), and they were supported by the declarations of Guardian's in-house counsel and an attorney representing Guardian in the two actions. Guardian said the emails were privileged communications between Guardian's legal counsel, owners and then officers, including Simpson and Dotterer, "discussing sensitive, confidential and legal issues and claims involving two Guardian employees." Each had the legal counsel's signature block which listed her title and a paragraph indicating they were "'intended only for the use of the addressee(s) . . . and may contain information that is privileged, confidential and exempt from disclosure under applicable law.'" Simpson had allegedly forwarded two of the emails to her personal email address while still employed by Guardian, and the third was forwarded to her personal email address by Dotterer after Simpson's termination.

---

[2] Guardian, John, StorAmerica Management, and Piccio were all movants on the disqualification motions. For simplicity, we refer to the movants, collectively, as Guardian.

7

Although Guardian informed Aarons the emails were privileged and asked they be returned and not be further used, Aarons refused. Guardian argued Aarons impermissibly reviewed the emails in-depth, failed to notify Guardian about having them, and indicated an intent to use them to support its client's claims and defenses in the Simpson and Dotterer actions. From Guardian's perspective, disqualification was required to protect Guardian's rights and to "'"preserve the integrity of the judicial proceedings"'" since there [was] a 'genuine likelihood,' if not certainty, that Aarons' review of the privileged communications [would] 'affect the outcome of the proceedings.'"

The former employees opposed the motions. Among other things, they argued disqualification was unwarranted for the following reasons: (1) the emails were not subject to the attorney-client privilege because Guardian's legal counsel was assisting with business decisions, not giving legal advice; (2) even if the emails were privileged, Simpson could waive the privilege as to emails she authored; and (3) Guardian impliedly waived the privilege by putting them directly at issue in their claims against Simpson and Dotterer, as well as by asserting an adequate investigation defense to the former employees' claims.

IV.

TRIAL COURT'S RULING

Based on the timing of the disqualification motions, the trial court first held a hearing on the motion in the Simpson action. It provided a tentative ruling denying the motion, which it confirmed as its final ruling after hearing argument from the parties. Without doing an in camera review of the emails, the court concluded they were attorney-client privileged and Guardian, not Simpson, was the privilege holder. Nevertheless, quoting a

8

legal treatise, it indicated "'[c]ourts are reluctant to disqualify attorneys who receive confidential information regarding the opposing party from their own clients.'" The court found it significant that Simpson "was an intended recipient" of the emails, noting none of the cases cited by Guardian addressed a situation in which a document was intentionally sent to a party who later shares it with their counsel. In addition, it explained Guardian did not show how Simpson would use the privileged information to Guardian's disadvantage in the Simpson action because the content of the emails was not relevant to Simpson's wrongful termination case. All she needed to demonstrate was that she raised harassment and discrimination complaints and Guardian fired her because of it. The court further stated the emails "may help" Guardian with an adequate investigation defense, a defense which the court said "Guardian ha[d] not disclaimed an intention to assert."

Following the disqualification hearing in the Dotterer action, the court concluded there did not appear to be a reason why the result should be any different than in the Simpson action. Accordingly, it denied Guardian's motion. Although not reflected in its written ruling, the court expressed at the hearing that one of the considerations it "had in mind" when denying disqualification in the Simpson action was that the emails "were kind of at the heart of Guardian's claim[s]," and it found the same to be true about the claims in Guardian's cross-complaint in the Dotterer action.

Guardian timely appealed from the orders denying disqualification of Aarons.

## DISCUSSION

Guardian contends the trial court abused its discretion by failing to disqualify Aarons. It argues the court applied certain inappropriate legal standards and made some findings which are not supported by the

9

undisputed evidence. We agree the court erred, and we set forth the proper legal standards to facilitate the court's reconsideration of Guardian's motions on remand.[3]

I.

ATTORNEY DISQUALIFICATION LEGAL PRINCIPLES AND STANDARD OF REVIEW

"A trial court's authority to disqualify an attorney derives from its inherent power to 'control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto.'" (*Clark v. Superior Court* (2011) 196 Cal.App.4th 37, 47 (*Clark*).) "'A disqualification motion involves a conflict between a client's right to counsel of his or her choice, on the one hand, and the need to maintain ethical standards of professional responsibility, on the other. [Citation.] Although disqualification necessarily impinges on a litigant's right to counsel of his or her choice, the decision on a disqualification motion "involves more than just the interests of the parties." [Citation.] When ruling on a disqualification motion, "[t]he paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process."'" (*McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1119–1120 (*McDermott*).)

The protection of attorney-client privileged communications is an example of such a fundamental principle of our legal system. (*People ex rel.*

---

[3] We reject respondents' assertion that Guardian has waived its right to review of some of the disputed matters by failing to include certain factual information in its appellate briefs and failing to discuss legal authority that respondents relied on at the trial court level.

*Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1146.) Thus, under certain circumstances, an opposing attorney who fails to take necessary steps geared toward preserving the sanctity of an attorney-client privileged communication may be disqualified from further participation in litigation. (*Rico v. Mitsubishi Motors Corp.* (2007) 42 Cal.4th 807, 819 (*Rico*); *McDermott, supra*, 10 Cal.App.5th at p. 1120; see, e.g., *Clark, supra*, 196 Cal.App.4th at p. 55.)

Because disqualification is "'a prophylactic measure to prevent future prejudice to the opposing party from information the attorney should not have possessed[,]' an affirmative showing of existing injury from the misuse of privileged information is not required." (*McDermott, supra*, 10 Cal.App.5th at p. 1120.) At the same time, disqualification may not be used "'"simply to punish a dereliction that will likely have no substantial continuing effect on future judicial proceedings."'" (*Ibid.*) Hence, "'"""[m]ere exposure"' to an adversary's confidences is insufficient, standing alone, to warrant an attorney's disqualification."'" (*Ibid.*) The critical question in each case is whether there is a reasonable probability the attorney obtained privileged information which "'the court believes would likely be used advantageously against an adverse party during the course of the litigation. Though such information cannot be unlearned, and the lawyer who obtained it cannot be prevented from giving it to others, disqualification still serves the useful purpose of eliminating from the case the attorney who could most effectively exploit the unfair advantage.'" (*Ibid.*)

A ruling on a disqualification motion is generally reviewed for an abuse of discretion. (*Johnson v. Department of Transportation* (2025) 109 Cal.App.5th 917, 933 (*Johnson*).) That is, considering the legal principles and policies governing the court's discretion in the particular situation, we look to

11

whether the "decision is so irrational or arbitrary that no reasonable person could agree with it." (*Nissan Motor Acceptance Cases* (2021) 63 Cal.App.5th 793, 811) "We draw all inferences in favor of the prevailing party[,] . . . accept the trial court's resolution of conflicts in the evidence," and defer to the court's express and implied factual findings so long as they are supported by substantial evidence. (*Johnson*, at p. 933; see also *McDermott, supra*, 10 Cal.App.5th at p. 1121.)

## II.

### PRIVILEGE AND WAIVER

Before turning to other disputed aspects of the disqualification matters, we first address the issue of attorney-client privilege. Based on representation by Guardians' in-house legal counsel, the trial court found the emails are protected by the attorney-client privilege and determined Guardian is the holder of the privilege. While, unsurprisingly, Guardian's arguments on appeal embrace that premise, respondents defend the disqualification denial by reviving attacks they made below on the privileged nature of the emails. Specifically, they contend Guardian waived any privilege by (1) basing all its causes of action against Simpson and Dotterer, in part, on the emails; (2) defending against respondents' claims by asserting it took reasonable corrective action through, inter alia, an adequate investigation; and (3) defending against the harassment and retaliation

12

claims for which the emails are key to respondents' establishing a prima facie case.[4] We are not persuaded.

*A. Applicable Law*

"The attorney-client privilege . . . confers a privilege on the client 'to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer . . . .' The privilege 'has been a hallmark of Anglo-American jurisprudence for almost 400 years.' [Citation.] Its fundamental purpose 'is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters. [Citation.] . . . [¶] Although exercise of the privilege may occasionally result in the suppression of relevant evidence, the Legislature of this state has determined that these concerns are outweighed by the importance of preserving confidentiality in the attorney-client relationship." (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 732 (*Costco*).)

"'Once the proponent makes a prima facie showing of a confidential attorney-client communication, it is presumed the communication is privileged and the burden shifts to the opponent to establish waiver, an exception, or that the privilege does not for some other reason apply.'" (*McDermott, supra*, 10 Cal.App.5th at p. 1101.) Aside from express waiver, case law recognizes waiver may be implied under certain

---

[4] Unlike in the trial court, respondents' arguments on appeal are limited to waiver. They do not challenge the trial court's underlying determinations that the emails would otherwise be attorney-client privileged and Guardian is the privilege holder. Notably, even below, respondents did not argue that any portion of the emails at issue were not privileged because they, for example, contained statements by someone other than Guardian's legal counsel which fell outside the scope of the attorney-client privilege.

circumstances. Relevant to respondents' arguments here, implied waiver may be shown by demonstrating "the client has put the otherwise privileged communication directly at issue and . . . disclosure is essential for a fair adjudication of the action." (*Southern Cal. Gas Co. v. Public Utilities Com.* (1990) 50 Cal.3d 31, 40 (*Southern Cal. Gas*).) In contrast, "'where the substance of the protected communication is not itself tendered in issue, but instead simply represents one of several forms of indirect evidence in the matter,'" there is no implied waiver of the attorney-client privilege. (*Id.* at p. 41.)

*B. Analysis*

We begin with Guardian's claims against Simpson and Dotterer. Respondents assert Guardian waived privilege as to the emails by "specifically referenc[ing] [the] emails as part of [its] claims in all [its] causes of action against both [Simpson and Dotterer]." However, a thorough review of the pleadings demonstrates Guardian's claims are not based on the content of the emails. Rather, they are based on what Simpson and Dotterer allegedly did with the emails—i.e. transmit them to their personal email addresses. While Guardian will have to establish the general confidential or privileged nature of the emails to prevail on some of its claims, it may do so, as it contemplates, by relying on matters other than their detailed content. This may include, for example, testimony concerning who they were sent by and to, as well as the signature block on the emails which included a confidential communication warning. (See *Costco*, *supra*, 47 Cal.4th at p. 739 ["[B]ecause the privilege protects a *transmission* irrespective of its content, there should be no need to examine the content in order to rule on a claim of privilege"].)

Adopting respondents' argument would mean that whenever a party sues another for improperly taking attorney-client privileged

14

documents, the party would be deemed to have waived the privilege. Such a result runs contrary to the law's deeply rooted protection of attorney-client privileged matters and is unsupported by any of the authority respondents cite.

Turning to respondents' cause of action for failure to prevent harassment and/or retaliation, it is undisputed a defense to such a claim would be that Guardian adequately investigated the relevant employee complaints and took appropriate action based thereon. (See *Wellpoint Health Networks, Inc. v. Superior Court* (1997) 59 Cal.App.4th 110, 128 (*Wellpoint*).) The trial court stated "Guardian ha[d] not disclaimed an intention to assert this defense," and relied on *Wellpoint* to conclude Guardian, therefore, could not assert the attorney-client privilege with respect to the emails. In a similar vein, respondents rely on *Wellpoint* to argue implicit waiver.

We agree with Guardian that *Wellpoint* is inapposite under the circumstances for the same reasons expressed in *Kaiser Foundation Hospitals v. Superior Court* (1998) 66 Cal.App.4th 1217, 1226–1227 (*Kaiser*).

"In *Wellpoint,* a prelitigation investigation into an employee's discrimination claims was conducted by an attorney hired by the employer for that specific purpose. After the employee initiated a lawsuit against the employer alleging causes of action for racial discrimination in employment, the employee served a subpoena on the employer's attorney demanding production of all documents pertaining to the attorney's prelitigation investigation. The employer and its attorney refused production, citing the attorney-client privilege and the work product doctrine." (*Kaiser, supra*, 66 Cal.App.4th at p. 1223.) The court of appeal found the employer could not assert the attorney-client privilege or work product protection if it defended against the employee's claims by relying on the adequacy of its investigation.

15

(*Wellpoint, supra,* 59 Cal.App.4th at p. 128.) Its reasoning hinged on the fact that the employer's attorney conducted the investigation. (*Ibid.*) But, as explained in *Kaiser,* "*Wellpoint* did not make a blanket holding that the attorney-client privilege and the work product doctrine are waived in every case that an employer puts the adequacy of its prelitigation investigation at issue." (*Kaiser,* at p. 1226.)

Here, the evidence submitted in conjunction with the motions showed Guardian's investigation into harassment complaints made by employees was performed by Claire, a nonattorney, not its legal counsel. Consistent with that fact, Guardian represented to the trial court, and continues to represent on appeal, it would rely on Claire's investigation, which it agrees is not privileged, if it chooses to assert an adequate investigation defense. Because disclosure of the privileged emails "is simply not essential for a thorough examination of the adequacy of the investigation or a fair adjudication of the action" under the circumstances (*Kaiser, supra,* 66 Cal.App.4th at p. 1227), the potential defense does not amount to an implied waiver of the privileged nature of the emails.

Respondents' final waiver argument concerns Simpson's retaliation claim. They argue the emails are part of the protected activity on which she is basing her claim and "Guardian is effectively trying to thwart her ability to prove her case and refute Guardian's position." We are not persuaded. The limited evidence submitted concerning the emails demonstrated they are communications from Guardian's legal counsel to Guardian's owners and executives; the trial court so found. There is no evidence they include communications by Simpson. And even if they did, there would be no privilege waiver because disclosure would not be essential for a fair adjudication of the action. (*Southern Cal. Gas, supra,* 50 Cal.3d at p.

16

40.) The content of the emails themselves would not be directly at issue, but it instead might "'simply represent[] one of several forms of indirect evidence in the matter.'" (*Id.* at p. 41.) Privileged communications are not discoverable and usable simply because they relate to, and/or are relevant to, issues raised in a case. (*Id.* at p. 45.) Indeed, "it has long been understood that "'[t]he privilege is given on grounds of public policy in the belief that the benefits derived therefrom justify the risk that unjust decisions may sometimes result from the suppression of relevant evidence.'"" (*Costco, supra*, 47 Cal.4th at p. 739.)

### III.

### AARONS' OBLIGATIONS

With the privileged nature of the emails established, and no waiver shown, the next question is what, if any, obligations Aarons had when it obtained the emails from Simpson and/or Dotterer. Guardian contends the obligations set forth in *State Fund* govern, making Aarons' failure to comply therewith grounds for disqualification under *Rico*. In conjunction with this argument, it asserts the court erred in treating Simpson and Dotterer as intended recipients and using that factual premise as a factor supporting denial of disqualification. Respondents argue *State Fund* is irrelevant and the circumstances are instead controlled by a handful of other cases which demonstrate the trial court ruled appropriately. Although we find *State Fund* factually distinguishable in certain respects, we conclude its requirements must apply equally to situations like the one before us.

*A. Inadvertent Disclosure Under* State Fund *and* Rico

In *State Fund*, the defendant's attorney received copies of certain attorney-client privileged communications belonging to the plaintiff because the plaintiff's attorneys inadvertently sent them to defendant's attorney

along with other produced discovery. (*State Fund, supra*, 70 Cal.App.4th at p. 647.) Defendant's attorney knowingly provided portions of the privileged documents to a defense expert and refused to return the documents when requested by the plaintiff's attorney. (*Id.* at pp. 648–649.) After determining the documents were privileged and there was no waiver of the privilege (*id.* at pp. 652–654), the appellate court considered what an attorney is ethically obligated to do when they receive, through inadvertence, documents plainly subject to the attorney-client privilege (*id.* at p. 651). The court determined an attorney's obligations are as follows: "When a lawyer who receives materials that obviously appear to be subject to an attorney-client privilege or otherwise clearly appear to be confidential and privileged and where it is reasonably apparent that the materials were provided or made available through inadvertence, the lawyer receiving such materials should refrain from examining the materials any more than is essential to ascertain if the materials are privileged, and shall immediately notify the sender that he or she possesses material that appears to be privileged. The parties may then proceed to resolve the situation by agreement or may resort to the court for guidance with the benefit of protective orders and other judicial intervention as may be justified."[5] (*Id.* at pp. 656–657.)

While *State Fund* expressly left open the possibility that an attorney's noncompliance with the obligations it set forth could merit disqualification in an appropriate case (*State Fund, supra*, 70 Cal.App.4th at p. 657), the Supreme Court later confirmed in *Rico* that disqualification is an available remedy for a *State Fund* rule violation (*Rico, supra*, 42 Cal.4th at p. 819). And applying the abuse of discretion standard, *Rico* concluded the trial

---

[5] We refer to these requirements as the *State Fund* rule.

court did not err in disqualifying an attorney under the presented circumstances. (*Ibid*.) Among the circumstances were the attorney's inadvertent receipt of a work product doctrine protected document, the attorney's noncompliance with the *State Fund* rule, the attorney's dissemination of the document to its experts, and the attorney's surreptitious use of the document's contents during a deposition of an opposing party expert. (*Rico,* at pp. 812–813.)

*B. Intentional Disclosure by Person Lacking Authorization to Disclose*

The circumstances before us are factually different than in *State Fund*, *Rico*, and other cases of inadvertent disclosure by the privilege holder to a lawyer. We are faced with a situation in which intended recipients of the privileged communications, whose receipt did not break the privilege, intentionally and unbeknownst to the privilege holder forwarded the communications to one of their personal email accounts and later provided them to an attorney representing them in their personal capacity against the privilege holder. The trial court concluded *Rico* and *State Fund* were not controlling because the person who provided the privileged emails to the attorney at issue was an "intended recipient of all [three] emails" and she provided them to her own counsel. We disagree.

The *State Fund* rule "is fundamentally based on the importance which the attorney-client privilege holds in the jurisprudence of this state." (*State Fund, supra*, 70 Cal.App.4th at p. 657.) *State Fund* expressed two primary justifications for it: (1) "a client should not enter the attorney-client relationship fearful that an inadvertent error by its counsel could result in the waiver of privileged information or the retention of the privileged information by an adversary who might abuse and disseminate the information with impunity"; and (2) "it has long been recognized that "'[a]n

19

attorney has an obligation not only to protect [their] client's interests but also to respect the legitimate interests of fellow members of the bar, the judiciary, and the administration of justice.""" (*Ibid.*)

The concepts underlying each of those justifications apply with equal force in the circumstances before us. (See *McDermott, supra,* 10 Cal.App.5th at p. 1109 [neither language of *State Fund* rule nor policy underlying it supports limiting its scope to situations involving inadvertent disclosure to attorney].) A business entity should not enter the attorney-client relationship fearful that a covert, intentional wrongful act by an employee could result in the waiver of privileged information or the retention of the privileged information by an adversary who might abuse and disseminate the information with impunity. In addition, an attorney does not respect the interests of fellow members of the bar, the judiciary, and the administration of justice when they receive what appears to be an attorney-client privileged communication that was impermissibly obtained and thereafter fail to take action that would allow the privilege holder to protect its privileged nature.

Here, Simpson and Dotterer were, in some sense, intended recipients of the emails because Guardian's legal counsel intentionally sent the emails to them. But, they received them in their capacity as executives of Guardian, not in their individual capacities. While they later provided them to their own attorney, they did so in their individual capacities so the attorney could represent them in their individual capacities against Guardian. The trial court overlooked the import of this distinction notwithstanding its adequately supported finding that there was no waiver of the attorney-client privilege.

A person who receives an attorney-client privileged communication because they are within the scope of those who may receive it

without waiving the privilege may not thereafter use it in their individual capacity without the privilege holder's authorization and claim to be an intended recipient for purposes of an attorney disqualification analysis. Concluding otherwise would encourage the unauthorized disclosure of attorney-client privileged communications in situations where there is, at minimum, a substantial question whether the privilege holder has waived the privilege.

For all these reasons, we find the *State Fund* rule, as refined in subsequent case law including *Rico*, equally applicable here, albeit with slight modification to align with the circumstances.[6] To be clear: When a lawyer receives material that the lawyer knows or reasonably should know is attorney-client privileged or subject to the work product doctrine, and it is reasonably apparent the material was impermissibly taken from the privilege holder without authorization, the lawyer receiving such material should refrain from examining the material any more than is essential to ascertain if it is privileged or subject to the work product doctrine, and shall immediately notify the privilege holder that they possesses the material. The parties may then seek to resolve any resulting disagreement through the courts.

Our conclusion is supported by *Clark*, in which another appellate court applied the *State Fund* rule to circumstances nearly identical to those before us. After the employer terminated its chief administrative officer, the latter sued the employer. (*Clark, supra*, 196 Cal.App.4th at p. 42.) During

---

[6] The *State Fund* rule was later codified by the State Bar of California in rule 4.4 of the California Rules of Professional Conduct. Like *State Fund*, that existing rule concerns "inadvertently sent or produced" writings and does not speak to the circumstances before us. (Rules Prof. Conduct, rule 4.4.)

discovery, the employer discovered the former employee had provided his attorney with a variety of the employer's attorney-client privileged documents, many of which were clearly marked as such, as well as other confidential documents taken in violation of a nondisclosure agreement signed by the former employee. (*Id.* at p. 43.) The appellate court affirmed disqualification of the former employee's attorney, largely relying on the *State Fund* rule and *Rico.* (*Clark,* at pp. 53–54.) It found the record contained evidence the attorney conducted an in-depth examination of the contents of the documents, and then they affirmatively used some of the information to craft a claim against the employer, question witnesses, and support the former employee's claims. (*Ibid.*) Because the attorney's continued involvement "could trigger doubts over the integrity of the judicial process" and "there was a 'genuine likelihood' [the] review of the privileged materials could affect the outcome of the proceedings," the court ultimately upheld the attorney's disqualification. (*Id.* at p. 55.)

*C. Privileged Documents Provided to Attorney by Their Own Client*

Respondents argue the *State Fund* rule does not apply to, and disqualification is not appropriate in, situations where an attorney receives an opponent's privileged documents from their own client, as Aarons did from Simpson and/or Dotterer. In doing so, they rely on cases which they claim establish that a party cannot improperly disclose their adversary's privileged information by providing it to their attorney for purposes of pursuing their own lawsuit. We are not persuaded the cases on which they rely stand for such a broad proposition.

First, a few of the cases cited by respondents involved wrongful termination or other employment claims brought by the defendant employer's former in-house counsel. (See *General Dynamics Corp. v. Superior Court*

22

(1994) 7 Cal.4th 1164, 1169; *Chubb & Son v. Superior Court* (2014) 228 Cal.App.4th 1094, 1108; *Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 308 (*Fox Searchlight*).) Due to the unique circumstances of a lawyer, who possesses a plethora of privileged information and who may face discipline for ethical violations related to that information, courts have permitted limited disclosure of such confidential information by an attorney-litigant who is contemplating a wrongful termination action against their former employer. (*Fox Searchlight*, at p. 310.) Doing so allows an attorney-litigant to "consult meaningfully with counsel to ensure the action can be pursued without a dismissal—and without disciplinary action for improper disclosure of confidences." (*Chubb*, at p. 1109; see also *Fox Searchlight*, at pp. 310–313.) The case before us does not involve similar considerations.

Second, although there may be other means for distinguishing the remaining case law cited by respondents, we agree with a distinction identified by another court that faced the same issue. The cases each involved a client transmitting to their attorney knowledge they had about another party's confidential or privileged information. (*Neal v. Health Net, Inc.* (2002) 100 Cal.App.4th 831, 843; *Bell v. 20th Century Ins. Co.* (1989) 212 Cal.App.3d 194, 198.) None involved, as here, the sharing of another party's privileged documents that were allegedly improperly taken from the other party. As explained in *Militello v. VFARM 1509* (2023) 89 Cal.App.5th 602, "[c]ourts cannot effectively police what a client, after reading or hearing another party's confidential communications, chooses to tell his or her lawyer. As the cases indicate, attempting to restrict oral disclosures of that sort risks undue interference with candid discussions between the client and counsel; and disqualification would, in any event, be an ineffective remedy because the client might provide the same information to new counsel. But it is an

23

entirely different matter if the client improperly obtained (or maintained) possession of written or digital copies of an adverse party's confidential information and provided them to counsel for use in litigation. Insisting that counsel not read purloined documents any more closely than is necessary to determine if they are privileged, as described in *Rico . . .* and [*State Fund*], and prohibiting their use if they are, will not inhibit legitimate attorney-client conversations; and a client whose counsel is disqualified for defying such a rule is not likely to repeat the violation." (*Id.* at pp. 621–622; see also *Johnson, supra,* 109 Cal.App.5th at pp. 948–949 [agreeing with *Militello* analysis].)

*D. Conclusion*

In implicitly rejecting the *State Fund* rule and basing its denial, in part, on Simpson and Dotterer's initial proper receipt of the emails, the trial court applied the incorrect legal framework.

IV.

FUTURE PREJUDICE

Another reason given by the trial court for denying disqualification was its conclusion that Guardian did not show "'how [Simpson] would use the privileged information to [Guardian's] disadvantage in this lawsuit—the required material link between the privileged information and the issues presented in this lawsuit.'" Guardian argues the court's conclusion was error because "[t]he undisputed record, including Aarons' own letters and opposition, establishes that the emails are material and that Aarons has used, and intends to further use, the emails against Guardian." We agree the trial court erred for two reasons.

To begin, the undisputed evidence showed Aarons intends to use privileged information from the emails at trial. The emails purportedly

24

contain Guardian's legal counsel's opinions and suggestions about the harassment and discrimination complaints made about Piccio and the head of human resources, as well as legal counsel's in-depth legal analysis of potential exposure to liability due to the head of human resources' assertions the complaints and Simpson's and Dotterer's actions related thereto were slanderous. Among the causes of action in the Dotterer action are: (1) a claim by Davis seeking to hold Guardian and Piccio responsible for Piccio's alleged harassment and creation of a hostile work environment; (2) a claim that Guardian's negligent hiring, supervision, and/or retention of Piccio caused Davis and Amezola to be harmed by his harassing and abusive conduct; and (3) a claim Guardian failed to prevent and remedy Piccio's harassment. Simpson also alleges Guardian failed to prevent and remedy the harassment. Based on the general nature of the emails established by the evidence, it is plain there is a reasonable probability Aarons obtained privileged information which "'would likely be used advantageously against'" Guardian in respondents' pursuit of their claims. (*McDermott, supra*, 10 Cal.App.5th at p. 1120.) And Aarons, having already included an allegation concerning the content of the emails in Simpson's cross-complaint against Guardian, has made clear its intent to do so.

In addition, the trial court wrongly restricted its focus to whether respondents would need to use the information to prove any element of their claims. The future prejudice with which the disqualification analysis is concerned is not limited to whether the privileged information will be used at trial. It more broadly looks at whether there is a genuine likelihood the attorney's obtaining of the opponent's privileged information "would impact the outcome of the [litigation] and the public's trust in both the scrupulous administration of justice and the integrity of the bar." (*McDermott, supra*, 10

25

Cal.App.5th at p. 1121; see also *Clark, supra,* 196 Cal.App.4th at pp. 54–55; *City of San Diego v. Superior Court* 30 Cal.App.5th 457, 472.) For example, even if it appears the privileged information would not be admissible at trial, a court should consider whether the information may give the attorney a strategic advantage during the discovery process, including depositions, or in trial preparation. (See *Rico, supra,* 42 Cal.4th at p. 819 [approving trial court's consideration of impact on attorney's deposition strategy and conduct]; *City of San Diego,* at p. 473, fn. omitted [among other things, court considers whether situation will provide "'unfair advantage'"].) It should likewise consider whether, and to what extent, the attorney's continued involvement in the case would degrade the public's trust in the justice system and the integrity of the legal profession. (See *Clark,* at p. 55.)

## V.

### CONCLUSION

Because the trial court erroneously found the *State Fund* rule inapplicable, made findings unsupported by the evidence, and failed to appreciate the full scope of the future prejudice factor of the disqualification analysis, we conclude the denial of disqualification was an abuse of discretion. Guardian requests we direct the trial court to disqualify Aarons or, alternatively, direct the court "to order Aarons to sequester, expunge, and return Guardian's attorney-client privileged emails." However, attorney disqualification is a discretionary consideration for the trial court which stems from its "'inherent power "[t]o control in furtherance of justice, the conduct of its ministerial officers."'" (*Sundholm v. Hollywood Foreign Press Assn.* (2024) 99 Cal.App.5th 1330, 1340.) Accordingly, we remand the matter to the trial court so that it may reconsider Guardian's motions in accordance with the proper legal standards.

## DISPOSITION

The challenged orders are reversed and the matter is remanded to the trial court with directions to (1) vacate the challenged orders, and (2) reconsider Guardian's disqualification motions in accordance with this opinion.


DELANEY, J.

WE CONCUR:


SANCHEZ, ACTING P. J.


GOODING, J.